1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

STANLEY RUSSELL MOORE,

Petitioner,

v.

DANNY SAMUEL, Warden,[1]

Respondent.

Case No.  20-cv-09285-SI (pr)

**ORDER DENYING HABEAS PETITION**

Re: Dkt. No. 1

Stanley Russell Moore filed this *pro se* action for a writ of habeas corpus under 28 U.S.C. § 2254 to challenge his conviction in Marin County Superior Court for attempted murder.  The court issued an order to show cause why the petition for writ of habeas corpus should not be granted, and respondent filed an answer.  Even though Moore was given the opportunity to do so, he has not filed a traverse, and the time frame for doing so has passed.  For the reasons discussed below, the petition for writ of habeas corpus will be DENIED.

**BACKGROUND**

The California Court of Appeal described the events leading to Moore's conviction as follows:

> Moore was charged with multiple crimes arising out of an incident in a parking lot on July 19, 2014.
>
> David Williams was the sales manager for a fireplace store in Mill Valley.  As a

---

[1] Danny Samuel, the current warden of the prison where Moore is incarcerated, has been substituted as respondent pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

courtesy to clients, Williams would hand out business cards of subcontractors who could install the fireplaces. One of those subcontractors was defendant, a plumber. At the time of the incident, Williams had known defendant for several years and they had a troubled history. Defendant had confronted Williams several times about handing out his business cards. In 2008, defendant accused Williams of favoritism to another contractor. Williams replied that his practice was to staple two business cards to every brochure, and it was up to the client to make the contact, not him. This did not mollify defendant. There were two or three more conversations between 2008 and 2014 where defendant said he needed more business and asked Williams what was going on and why was he not getting referrals. Williams testified to a particular phone call in 2012 when defendant was "[v]ery irate, very intense" and threatened to "come down there and kick your ass." And on one other occasion, defendant threatened him physically, but Williams did not remember precisely when. Williams testified that defendant had once threatened to beat him "long and hard."

July 19, 2014 was a Saturday, and at about 4:00 p.m. (store closing time) Williams was in the process of closing up and securing the facilities for the night. He walked out the back door and went over to his car when he saw defendant in his truck parked alongside the building with the window down. It was a hot day, and Williams made a joking comment to defendant as to whether he was working on his suntan. Defendant called Williams over to his truck. When Williams walked over and was about two feet away and asked what defendant wanted, he said "you ruined my life . . . I'm not making any money. I don't have any place to live and it's your fault. I'm going to kill you."

Williams expressed shock, and defendant said "come here." Williams took another step closer and defendant, with his hands in his lap, turned over his left hand and revealed a gun. Defendant then starting "spouting out" how Williams had wronged him and was to blame for all of defendant's troubles, and that he was going to kill Williams because Williams was "worthless, or treated him wrong," and everything was Williams's fault for defendant's situation.

Williams responded that he wasn't the cause of defendant's troubles, there was no reason to kill him, and it was only going to make matters worse. Defendant responded that he didn't care; he came there to kill Williams, and he was going to do it. Defendant's voice was escalating and emotional, and he started turning red. Williams could see that defendant had a clip in his right hand.

In this interchange, Williams described himself as talking fast and trying to convince defendant it wasn't the right thing to kill him. Defendant threatened to kill him at least 3 or 4 times. But after a few minutes of this back and forth, defendant said that today was Williams'[s] "lucky day," and he wasn't going to kill him. Williams immediately turned around and walked back toward his car shaking to "get the hell out of there," even though he had left the back door of the business open.

As soon as Williams approached his car, defendant came "barreling out of his truck at full speed," screamed "fuck it, I am going to kill you," and ran about 15-20 yards over to where Williams was standing at the front of his car. They were face to face.

Defendant was mad and screaming and held the gun in his right hand, waving it around. His face got red again, and he said he had been thinking about this for a long time, and should have done it long ago. Defendant said, "I'm going to put one in your shoulder and I'm going to put one in your knee, and I'm going to watch you suffer before I put one in your head." While defendant was saying this, he was "waving the gun around" so that the barrel of the gun sometimes pointed directly at Williams's face. The gun crossed Williams's face more than two, maybe three or four times. They were standing less than a foot apart, and the gun was six to eight inches from Williams' face. There was no point in time when defendant waved the gun below Williams's chest. Defendant threatened to kill Williams two or three times.

This period of gun waving lasted two and a half to three minutes. It appeared to Williams that defendant was holding the gun in a position that he could fire it. The barrel was in a position where Williams thought it could have been discharged and caused him harm at least three and perhaps four times, and Williams had no doubt that defendant was going to kill him.

Despite defendant's tirade, Williams kept talking to defendant ("running my mouth") and stated that he still had children to raise. It was not a conversation; there was "no interaction between" defendant's rant and what Williams was saying. Finally defendant stopped waving the gun, relaxed his shoulders and put the gun at his side. Williams hurried back in the store, locked the back door, and called 911.

Defendant also called 911, and said he felt like killing himself and was going to kill another person beforehand, but couldn't do either one. He repeatedly stated that he wanted to shoot the salesman of the fireplace store. The 911 call was in evidence.[FN 1]

[FN 1:] Defendant's preliminary hearing transcript was admitted in evidence. In that testimony, defendant admitted arriving at the fireplace store thinking about killing himself and Williams, admitting telling Williams he was thinking of killing himself and Williams, denied threatening Williams or pointing a gun at him, and said he repeatedly told Williams he had no intention of killing him.

During the encounter by the car, Williams did not see defendant move the slide back to the gun. And Williams answered no to the question whether defendant ever "aim[ed] the gun like police officers kind of point."

Marin County Deputy Sheriff Lauren Patton, who responded to the scene, testified that defendant said, as he was being handcuffed, that he wanted to kill himself today, but wanted to kill someone else first. Another deputy recovered a small black semiautomatic pistol from the toolbox on the front seat of defendant's truck, removed the magazine and locked the slide back from the gun. There were rounds visible in the magazine, but no round in the chamber. The gun was operable.

Marin County Deputy Sheriff Justin Zebb later searched defendant's truck and found a box of 380 ammunition that contained 50 rounds in the toolbox to the right of the

3

driver's seat; a 380 magazine with ammunition in it and a large kitchen knife (both next to the box of ammunition); and a 10-millimeter gun magazine in the driver's door pocket.

Defendant testified that he had thought about killing Williams for years. On the day in question he went to a hardware store and bought gloves and sulfuric acid. Then he went to MacDonald's in Mill Valley and published a lengthy Facebook post with his "final thoughts" and spelling out his grievances and threats against Williams and writing that "many times I have thought about showing him how serious I was and how damaging his refusal to work with me has been to me. . . . That man has no idea of how many times I have laid awake at night wishing him the gravest of harm." A half an hour later, he went to the parking lot of the fireplace store, knowing the store closing time was 4:00 p.m. and that Williams would be there.

When defendant was in the parking lot, he knew there was a magazine in his gun and assumed there were bullets in the magazine. He admitted that he brought ammunition to the scene, but claimed it was to damage the property in the store. He also thought about pouring the acid he purchased on the computers in the fireplace store.

*People v. Moore*, No. A146672, 2018 WL 1417911, at *1-3 (Cal. Ct. App. Mar. 22, 2018) (footnote in original and brackets added).

In 2015, following a bench trial, Moore was convicted of attempted murder (count one), unlawful threats (count two), carrying a loaded firearm with the intent to commit a felony (count three), carrying a loaded firearm in public (count four), and exhibiting a deadly weapon (count five). *Id*. at *3. As to counts one and two, the court found true the firearm use enhancements. *Id*. The court found Moore not guilty of assault with a firearm and found the premeditation allegation to the attempted murder charge not true. *Id*. On October 1, 2015, Moore was sentenced to the upper term of nine years on count one, and a consecutive four-year term for the firearm enhancement. 2CT 640-641, 643.; *see* 10RT 584-585.[2] The court imposed three-year terms on counts two and three but stayed those sentences pursuant to California Penal Code § 654. 10RT 585. It did not impose jail time on count four. 10RT 585. The total aggregate sentence imposed was thirteen years. 10RT 585.

In 2018, the California Court of Appeal affirmed Moore's judgment but remanded his

---

[2] The Clerk's Transcript ("CT") and Reporter's Transcript ("RT") have been lodged as respondent's Exhibits A and B, respectively. The number preceding CT or RT refers to the volume, and the number following CT or RT refers to the page.

United States District Court
Northern District of California

sentence to permit the sentencing court to consider striking the firearm enhancement in light of then-new state legislation.[3]  *See Moore*, 2018 WL 1417911, at *2[4] (citing Senate Bill No. 620, effective January 1, 2018).  The California Supreme Court denied review on June 13, 2018.  Docket No. 12-18 at 35-36.

On July 26, 2019, Moore filed a petition for writ of habeas corpus in the Marin County Superior Court.  Docket No. 12-19.  That court denied the petition on August 15, 2019.  Docket No. 12-20.

On September 12, 2019, Moore filed a petition for writ of habeas corpus in the California Court of Appeal.  Docket No. 12-21.  That court denied the petition on June 29, 2020.  Docket No. 12-21.

On July 27, 2020, Moore filed a petition for writ of habeas corpus in the California Supreme Court.  Docket No. 12-22.  That court denied the petition on October 14, 2020.  Docket No. 12-23.

On December 22, 2020, Moore filed the instant petition for writ of habeas corpus.  Docket No. 1.  The matter is now ready for decision.


### JURISDICTION AND VENUE

This court has subject matter jurisdiction over this action for a writ of habeas corpus under 28 U.S.C. § 2254. 28 U.S.C. § 1331.  This action is in the proper venue because the petition concerns the conviction and sentence of a person convicted in Marin County, California, which is within this judicial district.  28 U.S.C. § 84, 2241(d).


### LEGAL STANDARD

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the

---

[3] On remand, the sentencing court denied Moore's request to strike the enhancement.

[4] Page number citations refer to those assigned by the court's electronic case management filing system and not those assigned by the parties.

United States District Court
Northern District of California

Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254 to impose new restrictions on federal habeas review. A petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 411. "A federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was 'objectively unreasonable.'" *Id*. at 409.

The state-court decision to which § 2254(d) applies is the "last reasoned decision" of the state court. *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991). When confronted with an unexplained decision from the last state court to have been presented with the issue, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

Section 2254(d) generally applies to unexplained as well as reasoned decisions. "When a

United States District Court
Northern District of California

1   federal claim has been presented to a state court and the state court has denied relief, it may be

2   presumed that the state court adjudicated the claim on the merits in the absence of any indication or

3   state-law procedural principles to the contrary."  *Harrington v. Richter*, 562 U.S. 86, 99 (2011).

4   When the state court has denied a federal constitutional claim on the merits without explanation,

5   and there is no reasoned decision to look through to, the federal habeas court "must determine what

6   arguments or theories supported or . . . could have supported, the state court's decision; and then it

7   must ask whether it is possible fairminded jurists could disagree that those arguments or theories

8   are inconsistent with the holding in a prior decision of [the U.S. Supreme] Court."  *Id*. at 102.

9

10   **DISCUSSION**

11   A.  <u>Claim 1 - Right To a Fair Trial/Sufficiency of the Evidence</u>

12   Moore contends that his Sixth Amendment right to a fair trial was violated because the trial

13   judge failed to "require proof" of the elements of attempted murder.  Docket No. 1 at 5, 40-44.

14   Respondent argues that this constitutional claim is unexhausted but nonetheless should be

15   rejected on the merits.  The court agrees.

16   Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings

17   either the fact or length of their confinement are required first to exhaust state judicial remedies,

18   either on direct appeal or through collateral proceedings, by presenting the highest state court

19   available with a fair opportunity to rule on the merits of each and every claim they seek to raise in

20   federal court.  *See* 28 U.S.C. § 2254(b), (c).

21   Here, the federal constitutional claim is unexhausted because Moore did not present it to the

22   California Supreme Court.  In his petition for direct review to the California Supreme Court, Moore

23   claimed there was insufficient evidence to support the attempted murder count but relied solely on

24   the Fourteenth Amendment right to due process.  Docket No. 12-18 at 9.  He did not cite the Sixth

25   Amendment right to a fair trial or caselaw discussing such a right.  *See* Docket No. 12-18.  In his

26   state habeas petition filed in the California Supreme Court, Moore raised a similar claim to the one

27   he raises here.  *See* Docket No. at 4, 40-44, 87-90.  He did not, however, present the claim as a

28

United States District Court
Northern District of California

1   violation of the Federal Constitution.  *See id.*; *cf. Duncan v. Henry*, 513 U.S. 364, 366 (1995) (per

2   curiam) ("If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied

3   him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in

4   federal court, but in state court.").  A district court may deny, but not grant, relief on a habeas petition

5   that presents an unexhausted claim.  *See* 28 U.S.C. § 2254(b)(1).  The district court can deny an

6   unexhausted claim only when "it is perfectly clear that the applicant does not raise even a colorable

7   federal claim."  *Cassett v. Stewart*, 406 F.3d 614, 623-24 (9th Cir. 2005).  This court will deny relief

8   on the unexhausted federal constitutional claim because the claim is plainly meritless.

9       Moore's Claim 1 seems to be substantively similar to a claim of insufficient evidence based

10   on the Fourteenth Amendment, which he raised on direct review.  *See* Docket No. 1 at 5, 40-45.

11   Moore asserts that the state appellate court erred in applying state law on the elements of attempted

12   murder, and that if the correct interpretation is considered, there is insufficient evidence to support

13   his conviction.  *Id.*  Moore cites no authority for basing a claim of insufficient evidence in the Sixth

14   Amendment right to a fair trial.  *See id.* at 5.  Rather, claims of insufficient evidence are based on a

15   defendant's Fourteenth Amendment right to due process.  *See Jackson v. Virginia*, 443 U.S. 307,

16   315-18 (1979).

17       Respondent correctly maintains that the instant petition does not raise a Fourteenth

18   Amendment claim of insufficient evidence.  *See* Docket No. 1.  The record shows that Moore did,

19   however, exhaust such a claim on direct review.[5]  Specifically, Moore raised a due process challenge

20   to the sufficiency of the evidence to support the finding that the attempted murder was committed.

21   The California Court of Appeal's rejection of his due process claim constituted a reasonable

---

23   [5] In his petition for review before the state supreme court, Moore also claimed that the statute
24   under which he was convicted was vague, in violation of the due process clause.  *See* Docket No.
     12-18 at 6-7.  He did not, however, raise such a claim in the California Court of Appeal.  *See* Docket
25   No. 12-13 (Appellant's Opening Brief, Reply Brief).  Raising a claim for the first time on direct
     review in the California Supreme Court does not fairly present the claim and thus does not serve to
26   exhaust it.  *Casey v. Moore*, 386 F.3d 896, 918 (9th Cir. 2004) (holding that because petitioner
     "raised his federal constitutional claims for the first and only time to the state's highest court on
27   discretionary review, he did not fairly present them"); *see* Cal. R. Ct. 8.500(c)(1) ("As a policy
     matter, on petition for review the Supreme Court normally will not consider an issue that the
28   petitioner failed to timely raise in the Court of Appeal.").  Thus, this court agrees with respondent
     that any vagueness claim would be unexhausted should Moore attempt to raise it.

application of the standard from *Jackson*, 443 U.S. at 319, which requires the reviewing court to examine the evidence in the light most favorable to the prosecution in determining whether a rational trier of fact could have found the essential elements of a crime proven beyond a reasonable doubt.

The state appellate court summarized this claim and rejected it as follows:

We review a challenge to the sufficiency of the evidence in a criminal case by this familiar standard: we "must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) Our Supreme Court elaborated on our role in *People v. Kraft* (2000) 23 Cal. 4th 978: "The appellate court presumes in support of the judgment the existence of every fact the trier could reasonable deduce from the evidence. [Citations.] The same standard applies when the conviction rests primarily on circumstantial evidence. [Citation.] . . . ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. [Citation.]" ' " (*Id.* at pp. 1053-1054.)

As an appellate court we may not substitute our judgment for the judgment of the trial court as finder of fact. (See *People v. Ceja* (1993) 4 Cal.4th 1134, 1139.) Nor do we reweigh the evidence or reevaluate the credibility of witnesses. (*People v. Alexander* (2010) 49 Cal.4th 846, 917.) "Our authority begins and ends with a determination as to whether, on the entire record, there is *any* substantial evidence, contradicted or uncontradicted, in support of the judgment." (*ASP Properties Group v. Fard, Inc.* (2005) 133 Cal.App.4th 1257, 1266.)

" 'Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' (*People v. Ervine* (2009) 47 Cal.4th 745, 785.) 'The overt act element of attempt requires conduct that goes beyond "mere preparation" and "show[s] that [defendant] is putting his or her plan into action." [Citations.] [¶] . . . [T]he line between mere preparation and conduct satisfying the act element of attempt often is difficult to determine; the problem "is a question of degree and depends upon the facts and circumstances of a particular case." [Citation.] The act that goes "beyond mere preparation" need not constitute an element of the target crime [citation], and it " 'need not be the ultimate step toward the consummation of the design.' " [Citation.] Instead, " 'it is sufficient if [the conduct] is the first or some subsequent act directed towards that end after the preparations are made.' " [Citation.] In other words, . . . "the act must represent " 'some appreciable fragment of the crime.' " [Citations.]' [Citation]" (*People v. Hajek* (2014) 58 Cal.4th 1144, 1192, abrogated on other grounds by *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.)

But it is a longstanding principle that when the " 'design of a person to commit crime is clearly shown, slight acts in furtherance of the design will constitute an attempt.' "

(*People v. Superior Court* (*Decker*) (2007) 41 Cal.4th 1, 8.)

The mental state required to convict a defendant of attempted murder is intent to kill or express malice, which "may in many cases be inferred from the defendant's acts and the circumstances of the crime.  [Citation.]  There is rarely direct evidence of a defendant's intent.  Such intent must usually be derived from all the circumstances of the attempt, including the defendant's actions." (*People v. Smith* (2005) 37 Cal.4th 733, 741.)

The parties are in agreement that voluntary abandonment is not a defense to attempt once the defendant with the necessary intent commits an act directed toward committing the substantive offense, both citing *People v. Dillon* (1983) 34 Cal.3d 441, 454-455.  As our Supreme Court explained, "the law of attempts would be largely without function if it could not be invoked until the trigger was pulled, the blow struck, or the money seized." (*Id.* at p. 455.)  Once the attempt is underway, "a last-minute change of heart by the perpetrator should not be permitted to exonerate him." (*Ibid.*)

The appeal thus comes down to the narrow issue of the sufficiency of the evidence that defendant took a direct act with the specific intent to murder.  We believe substantial evidence supports the trial court's verdict.  Defendant had a lengthy and troubled history with Williams.  On the day in question, armed with a weapon and substantial amounts of ammunition and sulfuric acid, he expressed an intent to kill Williams on a long Facebook post.  Less than an hour later, he drove to the fireplace store and parked his truck on the side of the store, lying in waiting for Williams to come out of the store at the end of the business day as he knew he would.  With his weapon in hand, defendant motioned Williams over to the truck and explicitly *told* Williams that he was going to kill him.  A few minutes later, defendant came barreling out of his truck with the weapon loaded, again explicitly expressing his intent to kill Williams and even describing how he was going to do it and make Williams suffer, all the while waving the weapon, exposing the barrel of the gun to the plain view of William[s]'s face and repeating that he was going to kill him.  This was substantial evidence to support the trial court's implied finding that defendant's acts had progressed beyond preparation, and that defendant had taken a direct movement toward commission of the offense.  There was thus substantial evidence to support the conviction for attempted murder.

Our decision is supported by *People v. Morales* (1992) 5 Cal.App.4th 917, 926 (*Morales*), where a defendant was convicted of attempted murder without having actually fired a gun.  There Morales told his wife that he was going to "get her boyfriend."  Morales then went to his bedroom, loaded his gun, and as he left his house repeated that he was going to "get your fuckin' faggot boyfriend" (*id.* at p. 921), and then was coming back for her.  As he said this, he pointed the gun at his wife.  Morales then went to the boyfriend's house, and was later discovered there by police as he crouched by the side of the boyfriend's house behind a garbage pail three or four feet from the front steps from where the boyfriend was standing on the front porch.  The Court of Appeal held there was sufficient evidence to support Morales's conviction for premeditated attempted murder of the boyfriend because defendant's

conduct passed beyond mere preparation.  Disagreeing with appellant's contention that there was no evidence that he had committed some "'appreciable fragment'" of the crime, the *Morales* court stated "[o]ur Supreme Court has acknowledged that where the design of the accused is clearly shown, slight acts done in furtherance of the crime will constitute an attempt (*People v. Miller* [(1935)] 2 Cal.2d [527,] 531); it is not necessary that the overt act be the last possible step prior to the commission of the crime.  (*People v. Dillon*, *supra*, 34 Cal.3d at p. 453.)" (*Morales* at p. 926.)  On the facts of *Morales*, the attempt was complete because defendant threatened to get the boyfriend twice, went home, loaded his weapon, drove to the victim's house, and hid in a position that would "give him a clear shot" at the victim if he left the house by the front door.  (*Id.* at pp. 926-927.)

Defendant contends that in this case, his intent was equivocal, and he did not take a full clear step toward completing the crime, and that he abandoned the plan before he even took a step toward completing it.  Defendant attempts to distinguish *Morales*, and relied instead on drawing an analogy to the facts in *People v. Miller*, *supra*, 2 Cal.2d 527 (*Miller*).  We are not persuaded.  In *Miller*, the defendant, "somewhat under the influence of liquor" threatened at the town post office in Booneville to kill one Jeans, described as a "negro," because he had been annoying his wife and the authorities wouldn't "take charge of the matter." Jeans was described as having had "some association with the defendant and other white people" in Booneville for a number of years, and was that day working at a hop ranch owned by the town constable.  That afternoon, Miller went out to the ranch where Jeans and other people were in the field planting, carrying a rifle.  The constable was about 250-300 yards from defendant, and Jeans was about 30 yards beyond the constable.  Miller walked directly toward the constable, and after he had walked about 100 yards stopped and seemed to be loading his rifle.  He never lifted the rifle to take aim.  Jeans fled "at about right angles" to defendant's approach as soon as he saw defendant, although it wasn't clear precisely when he had made the move in relations to Miller's motion to load the weapon.  Miller, however, simply "continued toward" the constable, who took the gun from defendant, who offered no resistance.  In concluding that the evidence was insufficient to convict for attempted murder, the court reasoned that "no one could say with certainty whether the defendant had come into the field to carry out his threat to kill Jeans or merely to demand his arrest by the constable." (*Id.* at p. 529, 532.)

The case before us is different.  On the facts of *Miller*, the threat to kill the victim was not made to his face and was apparently motivated in part by the fact that the constable was not taking appropriate action.  When Miller got to the field and the constable himself was there, an inference could be drawn that Miller didn't need to take self-help measures, however misguided, and it would be unwise to do so in any event in front of the constable.  Here, however defendant made repeated threats to kill Williams in the harrowing minutes when he confronted him in the parking lot of the fireplace store and held the weapon inches away from his face.  We find no error.

*Moore*, 2018 WL 1417911, at *3-5 (footnotes omitted and brackets added).

The Due Process Clause "protects the accused against conviction except upon proof beyond

a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). A court reviewing a conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt and instead determines whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt may a court conclude that the evidence is insufficient. *See id.* at 324. The "prosecution need not affirmatively 'rule out every hypothesis except that of guilt,'" and the reviewing federal court "'faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *Wright v. West*, 505 U.S. 277, 296-97 (1992) (quoting *Jackson*, 443 U.S. at 326).

"*Jackson* leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors 'draw reasonable inferences from basic facts to ultimate facts.'" *Coleman v. Johnson*, 566 U.S. 650, 655 (2012) (per curiam) (quoting *Jackson*, 443 U.S. at 319). "Circumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction. . . . Nevertheless, 'mere suspicion or speculation cannot be the basis for creation of logical inferences.'" *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir.1995).

The *Jackson* standard is applied to a crime as that crime is defined by state law. *Jackson*, 443 U.S. at 324 n.16. The state court's interpretation of California law is binding in this federal habeas action. *See Hicks v. Feiock*, 485 U.S. 624, 629-30 (1988). The required mental state for attempted murder is express malice or the intent to kill, and the commission of "a direct but ineffectual act toward accomplishing the intended killing." *People v. Ervine*, 47 Cal. 4th 745, 785 (2009); *see* Cal. Penal Code § 188(a); *People v. Smith*, 37 Cal. 4th 733, 741 (2005). The defendant's intent may be derived from the circumstances of the attempt, including the defendant's actions. *Smith*, 37 Cal. 4th at 741; *see Arave v. Creech*, 507 U.S. 463, 473 (1993) ("The law has long recognized that a defendant's state of mind is not a 'subjective' matter, but a fact to be inferred from

United States District Court
Northern District of California

the surrounding circumstances.").

The overt act element of attempt requires conduct that goes "beyond mere preparation and show[s] that the killer is putting his or her plan into action." *People v. Superior Court (Decker)*, 41 Cal. 4th 1, 8 (2007) (citations omitted).

> [T]he line between mere preparation and conduct satisfying the act element of attempt often is difficult to determine; the problem is a question of degree and depends upon the facts and circumstances of a particular case. The act that goes beyond mere preparation need not constitute an element of the target crime, and it need not be the ultimate step toward the consummation of the design. Instead, it is sufficient if [the conduct] is the first or some subsequent act directed towards that end after the preparations are made. In other words, we have explained, the act must represent some appreciable fragment of the crime.

*People v. Watkins*, 55 Cal. 4th 999, 1021 (2012) (citations, quotation marks omitted). "Whenever the design of a person to commit crime is clearly shown, slight acts in furtherance of the design will constitute an attempt." *People v. Superior Court* (Decker), 41 Cal. 4th at 8; *see People v. Davis*, 46 Cal. 4th 539, 606 (2009).

Voluntary abandonment is not a defense to the offense of attempt. *People v. Dillon*, 34 Cal. 3d 441, 454-55 (1983). If the defendant had the requisite intent and committed a direct act toward the commission of the substantive offense, it is irrelevant that he may have thereafter voluntarily abandoned his efforts to commit the substantive crime. *Id.* at 455. Put otherwise, "a last-minute change of heart by the perpetrator should not be permitted to exonerate him." *Id.*

Here, the state appellate court reasonably rejected Moore's claim upon finding that substantial evidence supported the trial court's verdict based on the sufficiency of the evidence that Moore took a direct act with the specific intent to murder. As the state appellate court noted, Moore had a "lengthy and troubled" history with the victim. *Moore*, 2018 WL 1417911, at *4. The court further pointed out that on the day of the incident, Moore was "armed with a weapon and substantial amounts of ammunition and sulfuric acid." *Id.* In his own testimony, Moore expressed his intent to kill the victim in a Facebook post before the incident, and he admitted to wanting to kill the victim. 1CT 268-269; *see also* 9RT 375-379. According to Moore, he drove to the victim's place of work, had his gun in his lap, and sat there until the victim approached him. 9RT 377-381. After telling

13

the victim he was going to kill him, Moore exited his car, came within a foot of Williams, and waved the gun at the level of Williams's head, again expressing an intent to kill him.  8RT 179, 181, 205. At that point, the trier of fact could reasonably conclude that Moore had the requisite intent; he verbalized it and went beyond mere preparation.  Only the act of pulling the trigger separated this from an attempt and a murder.  The fact that Moore ultimately decided not to follow through does not change the equation.  *See People v. Dillon*, 34 Cal. 3d at 454-55.  The state appellate court's reliance on this evidence to reject the challenge to the sufficiency of the evidence was a reasonable application of the standard from *Jackson*.

It cannot be said that the state appellate court's rejection of Moore's due process challenge to the sufficiency of the evidence was "objectively unreasonable."  *See Coleman*, 566 U.S. at 651. Moore therefore is not entitled to the writ of habeas corpus on this claim.

## B.  Claim 2 - Prosecutorial Misconduct

Moore claims that the prosecutor, Deputy District Attorney Lori Frugoli, committed misconduct by (a) misstating facts on multiple occasions and (b) demonstrating personal bias against Moore.  Docket No. 1 at 7, 45-50.

Moore raised his prosecutorial misconduct claims on collateral review.  Docket No. 12-22 at 5.  The state supreme court denied these claims summarily, as had the appellate and superior courts before it.  Docket Nos. 12-20, 12-21, 12-23.  Thus, the claims at issue were denied in the state court without a reasoned decision.  This court therefore "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the U.S. Supreme] Court."  *Harrington v. Richter*, 562 U.S. at 102.

### 1.  Applicable Law

The appropriate standard of review for a prosecutorial-misconduct claim in a federal habeas corpus action is the narrow one of due process and not the broad exercise of supervisory power.

*Darden v. Wainwright*, 477 U.S. 168, 181 (1986) ("it 'is not enough that the prosecutors' remarks were undesirable or even universally condemned'"); *Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor").

Under *Darden*, the first issue is whether the prosecutor's remarks were improper; if so, the next question is whether such conduct infected the trial with unfairness. *Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005); *see also Deck v. Jenkins*, 814 F.3d 954, 978 (9th Cir. 2016) (recognizing that *Darden* is the clearly established federal law regarding a prosecutor's improper comments/remarks for AEDPA review purposes). A prosecutorial misconduct claim is decided "'on the merits, examining the entire proceedings to determine whether the prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Johnson v. Sublett*, 63 F.3d 926, 929 (9th Cir. 1995); *see Trillo v. Biter*, 769 F.3d 995, 1001 (9th Cir. 2014) ("Our aim is not to punish society for the misdeeds of the prosecutor; rather, our goal is to ensure that the petitioner received a fair trial."). The "*Darden* standard is a very general one, leaving courts 'more leeway . . . in reaching outcomes in case-by-case determinations.'" *Parker v. Matthews*, 567 U.S. 37, 48 (2012) (omission in original) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Habeas relief is not warranted unless the state court's rejection of the claim was an unreasonable application of the *Darden* standard. *Parker v. Matthews*, 567 U.S. 37 (2012) (per curiam).

### 2. Analysis

#### a. Alleged Misstatements of Facts

Moore asserts that the prosecutor misstated facts on seven occasions during the bench trial and at the sentencing hearing where she requested the maximum term. Docket No. 1 at 45-48; *see also* 10RT at 548-549, 559 (prosecutor seeking maximum term).

##### i. Moore's Statement Concerning Shooting the Victim

Moore challenges the italicized portion of the quoted passage below, which was part of the

prosecutor's argument in her closing statement at trial:

> [Moore] specifically said, I'm going to shoot you in the knees, in the shoulder, and then I'm going to have you suffer some more and shoot you in the head. *If shooting a person in the shoulder and the knee doesn't accomplish death, certainly shooting them in head would.* And those statements, with a loaded gun at Mr. Williams with the defendant right in his face with that gun, shows his clear intent, his premeditation to make sure he accomplished what he wanted to. And he communicated those thoughts not only verbally, but beforehand in writing, and as I stated on social media.

9RT 497 (emphasis added); *see* Docket No. 1 at 45.

Moore's claim is unclear, but he appears to claim that the prosecutor misinterpreted his statements. *See* Docket No. 1 at 45. Moore explains, "that [his] mention of any shooting of Dave Williams was taken from what [he] had seen in the movie *Lonesome Dove* where a movie character spoke of shooting his companion to disable him and *not* to kill him." *Id.* (emphasis in original). Moore acknowledges that this was a "morbid thought of shooting to disable" but argues that the prosecutor "took a morbid thought and falsely converted it into a plan for murder so that she could argue wrongly for a conviction for attempted murder." *Id.*

As mentioned, the inquiry under *Darden* is whether the prosecutor's remarks were improper and, if so, whether the comments infected the trial with unfairness. *See Tan*, 413 F.3d at 1112. Prosecutors enjoy "reasonably wide latitude" in fashioning closing argument. *See United States v. Gorostiza*, 468 F.2d 915, 916 (9th Cir. 1972) (per curiam). A prosecutor may "strike hard blows" based on the evidence and all reasonable inferences derived therefrom. *United States v. Tucker*, 641 F.3d 1110, 1120 (9th Cir. 2011) (internal quotation omitted).

First, the court notes that the record shows that trial counsel did not object to the prosecutor's argument at issue. *See* 9RT 834. Thus, the state court could have reasonably found that Moore had forfeited any challenge to the prosecutor's argument because his attorney failed to object and request an admonition. In addition, the state court could have determined that, even if the claim was not forfeited, the prosecutor's argument constituted a reasonable inference from the statements Moore made to the victim concerning shooting him in the shoulder, knee, and head, respectively. *See* 8RT 180-181; 9RT 383-384, 497; *see also Moore*, 2018 WL 1417911, at *44. Thus, it would have been reasonable for the state court to find that the prosecutor did not commit misconduct when she argued,

based on Moore's previous statements to the victim, that Moore's words accompanied by his actions demonstrated his intent and premeditation.

Moreover, Moore fails to explain how the prosecutor's argument rendered the trial fundamentally unfair. Even assuming some impropriety, the state court could have reasonably found the prosecutor's argument was inconsequential and did not render the trial fundamentally unfair. The prosecutor made such remarks in the context of arguing that Moore's attempted murder was premeditated and deliberate. *See* 9RT 496-498. As mentioned above, it was a fair inference that Moore's words accompanied by his actions demonstrated his intent and premeditation. "The prosecutor may argue reasonable inferences from the evidence presented." *Menendez v. Terhune*, 422 F.3d 1012, 1037 (9th Cir. 2005). Lastly, the record shows that the trial court did *not* find that the attempted murder was premeditated and deliberate. *See* 9RT at 527; *see also Moore*, 2018 WL 1417911, at *3.

### ii. Statement That Moore Was Mad at the Victim

Moore contends the prosecutor "concocted from thin air the assertion that [Moore] was mad at [the victim] when [he] said it was a matter of life or death that [he] get work." Docket No. 1 at 46. Moore provides no citation, however, for the alleged statement by the prosecutor. *Id.* Rather, he cites only to his own type-written document entitled, "Final Thoughts by Stan Moore July 19, 2014," which allegedly formed the basis for the prosecutor's statement. Docket No. 1 at 46 (citing Docket No. 1-3 at 55).

Even assuming the prosecutor stated that Moore was mad at the victim when he told the victim that getting referrals was a "matter of life or death," *see id.*, the state court could have determined that such a statement did not make the trial fundamentally unfair. Any statement that Moore was mad at the victim would be a reasonable reference from the record. Moore admittedly acted off his anger over the victim's failure to give him referrals. *See* 8RT 179, 214-215, 431-432, 435-436, 438-439 (testimony that Moore was angry at the victim at the time of the offense). Moore also acknowledged that when he told the victim that referrals were a "matter of life or death", and

the victim responded by asking whether Moore was threatening him, he responded, "Yes," despite claiming that he apologized afterwards.  Docket No. 1-3 at 55-56.  Moore also admitted on the stand that he had thought about killing the victim for years.  9RT 411-412.  Accordingly, if as Moore alleges, the prosecutor stated or argued that he was mad at the victim when he told the victim that referrals were a matter of life or death, the state court could have determined that such a statement or argument was a reasonable inference from the evidence.

### iii.    Statement Concerning Probation Report

Moore contends that at sentencing, the prosecutor "falsely claimed" that the probation report "improperly use[d] narcissism as a mitigating factor in their probation assessment."  Docket No. 1 at 46.

The comment at issue was made during the prosecutor's argument to the court at sentencing. 10RT 551.  Referring to the probation report, the prosecutor stated as follows: "They have indicated, 'He was suffering from a mental or physical condition that significantly reduced his culpability.'  I think there is no legal authority to rely upon a person's narcissism as a mitigating factor."  10RT 551.  Though the probation report did not indicate that it was relying on narcissism as a mitigating factor, it did mention Moore's mental condition as a mitigating factor, and contrary to Moore's assertion, the probation report *does* mention findings of narcissism in addition to other mental health issues.  Docket No. 12-24 at 653-655.  Regardless, the record shows that the trial court recognized that Moore suffered from mental health issues, despite the challenged statement.  *See* 10RT 579. Thus, the state court reasonably rejected this claim because the prosecutor's statement was not consequential.

### iv.    Statement Concerning Remorse

Moore contends the prosecutor misstated the facts by arguing at sentencing that he was not remorseful in any "way, shape or form."  Docket No. 1 at 47; *see* 10RT 549-550.  The cited comment was part of the prosecutor's argument during sentencing.  *See* 10RT 549-550.  Moore was given the

opportunity to speak at sentencing, and he stated his disagreement with the prosecutor's remark concerning his lack of remorse. *See* 10RT 565, 567. The state court could have reasonably determined that this comment by the prosecutor was neither improper nor consequential.

### v. Statement Concerning Home Address of Helen Snyder

Moore claims the prosecutor committed misconduct by stating that Moore "wanted prosecution witness Helen Snyder[6] to know that he had her home address."[7] Docket No. 1 at 47. The contention is meritless. Moore provides no citation for the prosecutor's statement, but we assume he refers to the prosecutor's statement at sentencing that by defendant sending Ms. Snyder a letter, the prosecutor thought "it was intimating that he wanted her to know that he had her home address and got it from the Public Defender." 10RT 558-559. Moore does not dispute that he wrote such a letter, and he attaches it to his petition. Docket No. 1-2 at 19-20. Moore asserts the prosecutor's argument was misconduct as he "never mentioned that [he] had [Ms.] Snyder's home address [be]cause [he] never had it." Docket No. 1 at 4 (bracke20-ts added). Instead, Moore claims that he wrote Ms. Snyder "at her postal box number, which was not the site of her home, [he] presume[d]." *Id.*

The state court could have reasonably found that Moore failed to show misconduct by the prosecutor. He points to nothing on the record reflecting exactly where he sent Ms. Snyder the letter. Further, immediately after hearing the prosecutor's argument about the letter, Moore spoke to the sentencing court, addressed the issue of the letter to Ms. Snyder, but did not deny the prosecutor's inference and did not deny that he had Ms. Snyder's home address, "I didn't intend to be a threat to Helen Snyder, either. I offered friendship to her. If you read the letter carefully, I offered a hand of friendship to her, even though I felt like she had contacted the Sheriff's

---

[6] Ms. Snyder contacted law enforcement and the victim's place of business, the fireplace store called London Chimney, after she came across Moore's Facebook post and became concerned for the victim's safety. *See* 1CT at 235, 263-264; *see also* Docket No. 1-2 at 19-20.

[7] The record shows Ms. Snyder was listed as part of the prosecution's witness list, see 1CT at 229, but she was not called as a witness at the preliminary hearing or trial, *see* 8RT at 145-146.

United States District Court
Northern District of California

Department." 10RT 568.  The court notes that the prosecutor's comment was also made at sentencing, after the verdict, and Moore fails to show how the comment could have altered the sentence he received.  Moore fails to show the factual premise for his contention, or even assuming that premise, that the prosecutor's comment deprived him of due process at sentencing.  The state court reasonably rejected his claim on either grounds or both.

<strong>vi.</strong>    <u>Introduction of Allegedly Misleading Video</u>

Moore contends the prosecutor committed misconduct by introducing into evidence a "misleading video by Marin County Sherrif[f]'s Dept. firearms expert Eric Richardson," who testified for the prosecution.  Docket No. 1 at 47.  The record shows that the purpose of that video was to show a recording of Richardson examining the gun Moore used, and then test-firing it at a firing range to show the gun was operable.  *See* 8RT 156-157, 296, 306, 308-317.

Moore asserts the video "did not authentically portray what [he] would have experienced if he had attempted to fire his own gun . . . [and] [t]his misleading video was not necessary to fulfill any element of law, but was introduced into evidence to prejudice the court against [him]."  Docket No. 1 at 47-48.  However, the state supreme court reasonably rejected such a claim because the record shows that the video did not purport to reflect Moore's actions.  *See* 8RT 156-157, 296,308-317.  Further, trial counsel neither objected to Mr. Richardson's testimony nor to the submission of the video into evidence.  *See* 8RT 299, 310, 317, 333.  Thus, the state supreme court could have reasonably found that Moore had forfeited any challenge to the introduction of this video because his attorney failed to object.

<strong>vii.</strong>    <u>Statement That Moore Claimed He Did Nothing Wrong</u>

Moore raises one last claim involving the prosecutor's alleged misstatement at the sentencing hearing, and Moore states as follows: "Prosecutor Frugoli stated that [Moore] stated that 'he did nothing wrong in this case.'  This was an utterly false statement contra[di]cted by

exhibits . . . ."  Docket No. 1 at 48; *see* 10RT 560.[8]  The state court could have reasonably determined that such a comment during sentencing did not amount to a due process violation when considered in the context of the entire sentencing hearing.  The prosecutor's statement was not prominent as part of her argument during sentencing.  The statement was but a small part of the prosecutor's argument, comprising one sentence at the end of an argument that took 14 pages of the reporter's transcript.  *See* 10RT 548-561.  Furthermore, the defense had an opportunity to respond to the statement.  The record shows that Moore himself was given the opportunity to rebut the prosecutor's statement when he addressed the sentencing court as follows: "[I]t was my fault that day.  There is no doubt about it.  I am here because of what I did."  *See* 10RT 568.  When the prosecutor's statement is viewed in light of these circumstances, the state court's rejection of the claim was not contrary to or an unreasonable application of *Darden,* which requires the reviewing court to determine whether the prosecutor's comment so infected the trial—or in this case the sentencing hearing—with unfairness so as to amount to a denial of due process.

### b.    Alleged Personal Bias Against Moore

Moore contends that the prosecutor committed misconduct against him during the sentencing hearing by "demonstrat[ing] personal bias against [him] through [her] statements in open court," including the following statements of showing her "unsupported [and] biased opinion": "I am extremely offended that defendant received a favorable probation report," (*see* 10RT 554[9]); and "[T]here is no cure for this man's problems," (10RT 550).  Docket No. 1 at 48.  The court finds no Supreme Court holding for the proposition that a prosecutor may commit misconduct, let alone violate a defendant's right to due process, simply by being personally biased against the defendant,

---

[8] Moore cites "RT 360: 3,4," but no such statement can be found on that page, and the court notes that the correct location he should have cited was "10RT 560."  *See* 10RT 560.

[9] The court notes that Moore cites "10RT 559" for the prosecutor's statement relating to her umbrage concerning Moore's favorable probation report, but no such statement can be located on that page.  Instead, the court has found the following statement from the prosecutor during sentencing on an earlier page, "I am extremely offended and don't, in any way, understand how this probation officer could find that this victim had no unique vulnerability."  10RT 554.

United States District Court
Northern District of California

1   short of actions that "so infect[] the trial with unfairness as to make the resulting conviction a denial

2   of due process.'" *Darden*, 477 U.S. at 181 (quoting *Donnelly v. DeChristoforo*, 416 U.S. at 643

3   (1974)).   The state court could have reasonably found that Moore's cited actions below do not

4   demonstrate bias, misconduct, or a violation of due process.

5

6                    i.      <u>Umbrage Concerning Moore's Favorable Presentence Report</u>

7          Moore asserts the prosecutor stated that she was "extremely offended that defendant received

8   a favorable probation report."  Docket No. 1 at 48.  As mentioned, the court cannot find this exact

9   statement in the record and construes this IAC claim as Moore alleging that the prosecutor showed

10  bias against him by saying the following statement at sentencing: "I am extremely offended and

11  don't, in any way, understand how this probation officer could find that this victim had no unique

12  vulnerability." 10RT 554; *see* Docket No. 24 at 12 (presentence report finding, "The victim was an

13  acquaintance of the defendant, but had no unique vulnerability").   The state supreme court

14  reasonably rejected this claim because Moore fails to explain how the prosecutor's statement—

15  relating to her belief that the victim was indeed vulnerable—translates to a personal bias against

16  Moore.  In any event, the record shows that the sentencing court agreed with the prosecutor and

17  found the victim was particularly vulnerable in this case, stating as follows:

18          I agree with Ms. Frugoli that, pursuant to Rule 4.421, subdivision (A), subdivision
            (3), I do think, in a way, Mr. Williams was pretty vulnerable.  He was leaving his
19          business via the back entrance, where there were no other people.  The defendant
            was sort of lying in wait for him to come out, knowing that no one would be around,
20          and that he was, potentially, in a very isolated and vulnerable situation.  So I do think
            the victim was particularly vulnerable in this particular case.
21
22  10RT 582.  Thus, the state supreme court could have also found this claim to be without merit.

23

24                   ii.     <u>Statement That There Was "No Cure" for Moore's Problems</u>

25         Moore claims the prosecutor also demonstrated a personal bias against him by making the

26  following argument at sentencing:

27          And there are some frightening things that were brought up in the psychological
            evaluation put forth by the defense.  And it is clear to the people, as I noted in my
28          statement in aggravation, that *there is no cure for this man's problems*.  He dug a

22

hole for himself.  He made all of these decisions, and then he decided Mr. Williams was the way out.

10RT 550 (italics added).

Moore explains that the comment that there was "no cure" for his problems was "unsupported, biased opinion."  Docket No. 1 at 48.  The record shows that the prosecutor did not purport to offer expert opinion, but instead offered such a comment as part of her argument at sentencing.  There is no impropriety, much less a violation of due process in the argument, as the state court could have reasonably found when rejecting this claim.

c.      Summation

In sum, the state court's rejection of this prosecutorial misconduct claim against Deputy District Attorney Frugoli—based either on her alleged misstatements of facts or on her alleged personal bias against Moore—was not contrary to, or an unreasonable application of, clearly established federal law.  Moore is not entitled to habeas relief on this claim.

C.  Claim 3 - Ineffective Assistance of Counsel ("IAC")

Moore contends that his trial and appellate counsel provided ineffective assistance.  Docket No. 1 at 8, 51-69; Docket No. 1-1 at 1-12.

The Sixth Amendment guarantees not only assistance, but the effective assistance, of counsel.  *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result.  *Id.* In order to prevail on a Sixth Amendment ineffective assistance of counsel claim, a petitioner must satisfy a two-prong test.  First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms.  *Id.* at 687-88.  Second, he must establish that he was prejudiced by counsel's deficient performance; he must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.  A reasonable probability is a

United States District Court
Northern District of California

1  probability sufficient to undermine confidence in the outcome. *Id.*

2   A "doubly" deferential judicial review is appropriate in analyzing ineffective assistance of

3  counsel ("IAC") claims under § 2254. *See Cullen v. Pinholster*, 563 U.S. 170, 202 (2011). The

4  "question is not whether counsel's actions were reasonable. The question is whether there is any

5  reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington v.*

6  *Richter*, 562 U.S. 86, 105 (2011).

7   A lawyer need not file a motion or make an objection that the lawyer knows to be meritless

8  on the facts and the law. *See Wilson v. Henry*, 185 F.3d 986, 990 (9th Cir. 1999) ("to show

9  prejudice under *Strickland* from failure to file a motion, [a petitioner] must show that (1) had his

10  counsel filed the motion, it is reasonable that the trial court would have granted it as meritorious,

11  and (2) had the motion been granted, it is reasonable that there would have been an outcome more

12  favorable to him."). The failure of defense counsel to take a futile action does not constitute

13  ineffective assistance. *See Rupe v. Wood*, 93 F.3d 1434, 1444-45 (9th Cir. 1996).

14   A court need not determine whether counsel's performance was deficient before examining

15  the prejudice suffered by the defendant as the result of the alleged deficiencies. *See Strickland*, 466

16  U.S. at 697.

17   A difference of opinion as to trial tactics does not constitute denial of effective assistance,

18  *see United States v. Mayo*, 646 F.2d 369, 375 (9th Cir. 1981), and tactical decisions are not

19  ineffective assistance simply because in retrospect better tactics are known to have been available.

20  *See Bashor v. Risley*, 730 F.2d 1228, 1241 (9th Cir. 1984), *cert. denied*, 469 U.S. 838 (1984).

21   The petitioner bears the burden of rebutting the strong presumption that strategic decisions

22  by counsel are reasonable, and the absence of evidence cannot overcome the presumption. *Dunn v.*

23  *Reeves*, 141 S. Ct. 2405, 2410 (2021) (per curiam) (internal quotations omitted).

24

25   1.  The State Court Decisions

26   Moore raised his IAC claims on collateral review by first filing a state habeas petition in the

27  Marin County Superior Court, which includes a section with almost identical IAC claims as the

instant federal petition.  Docket No. 12-19 at 41-68.  The state superior court denied his IAC claims in a reasoned decision.  *See* Docket No. 12-20.  That court reviewed the legal standards, including that an IAC claim has two elements—deficient performance and prejudice.  *See id.* at 3 (citing *Strickland*, 466 U.S. at 687).  The state superior court denied Moore's IAC claims upon finding that Moore "failed to establish either of these elements" as to his first appointed attorney at his preliminary hearing, explaining as follows:

> According to Petitioner, his first attorney recommended that Petitioner waive time for his preliminary hearing.  Thereafter, after being fully advised of his speedy preliminary hearing rights by the court, Petitioner waived these rights.  Petitioner now complains that he should have had a speedy preliminary hearing.  Petitioner has failed to demonstrate that this advice by counsel was "ineffective" or that Petitioner was prejudiced in any way as a result of following this advice.  Accordingly, this claim fails.
>
> Next, Petitioner alleges that he was not properly prepared for his preliminary hearing because he testified without understanding the potential future consequences of doing so.  First, Petitioner admits that his counsel advised him <u>not</u> to testify at the preliminary hearing.  Despite this advice, Petitioner testified anyway.  During the subsequent trial, Petitioner's preliminary hearing testimony was (according to Petitioner) "used against him" at the trial by the prosecution.  Petitioner states that his counsel failed to sufficiently explain the ramifications of his decision to testify at the preliminary hearing and that he did not fully understand that his preliminary hearing testimony would harm him at trial.
>
> At the time of the preliminary hearing, Petitioner's counsel stated on the record that he was advising Petitioner not to testify.  Petitioner acknowledged this advice but chose to ignore it.  He cannot now claim fault with the attorney.  Accordingly this claim fails.

*Id.* at 3-4 (emphasis in original).  Next, the state superior court handled Moore's IAC claims focusing on his retained attorney against whom he brought ten listed claims,[10] which were also denied as follows:

> After the preliminary hearing, new counsel substituted in and represented petitioner during his court trial.  Petitioner claims that his attorney was ineffective in that:

---

[10] Moore raises all ten listed claims in his federal petition and his attached declaration to his petition.  *See* Docket Nos. 1, 1-1 (raising claims 1-10).  He lists eight out of the ten listed claims in his federal petition.  Docket Nos. 1 at 51-69, 1-1 at 1-12 (raising claims 1-5, 7-9).  Moore raises the remaining two claims in his declaration.  Docket No. 1 at 32-35 (raising claims 6 and 10).

25

1. Counsel failed to ask sufficient questions during the trial and was not effective as the prosecutor.

2. Counsel allowed the prosecutor to present misleading arguments.

3. Counsel convinced Petitioner to waive jury even though other attorneys suggested otherwise.

4. Counsel failed to bring character witnesses to testify on Petitioner's behalf.

5. Counsel failed to call friends who would say that he routinely has a hard time making decisions.

6. Counsel failed to provide an adequate gun expert, with a prepared video to show how the gun was not working properly.

7. Counsel failed to call Dr. Christine Naber Ph.D. to testify about Petitioner's inability to form specific intent.

8. Counsel did not know all of the answers Petitioner was going to give at trial.

9. Counsel refused to use (or acknowledge) the opening and closing statements written for him by Petitioner.

10. Counsel failed to adopt the trial theme proffered by petitioner titled "All is Not as it Appears."

Clearly, Petitioner is unhappy with counsel's representation, however none of his complaints support a finding that counsel's performance fell below a standard of reasonableness. Although Petitioner's attorney(s) did not do what Petitioner wanted him (them) to do, this does not mean that he/they was/were ineffective. Petitioner simply claims that his attorney(s) should have done things differently. He has failed however to present any evidence to suggest that his attorney's work product was ineffective, fell below a reasonable standard or that he was prejudiced in any way. Accordingly his claims are denied.

*Id.* at 4-5. Furthermore, the state superior court found no prejudice, stating as follows:

Although addressed above, even if Petitioner were successful in his claim that representation at the preliminary hearing and/or trial was ineffective, he must also show that he was denied a fair trial as a result of those deficiencies. Petitioner has not met his burden. The evidence in the case was overwhelming. All of Petitioners statements and thoughts (stated in this Petition) were also presented to the fact finder at the time of trial when Petitioner testified. Petitioner had an ample opportunity to speak "his truth." Additionally, the fact finder obviously considered his testimony (i.e., vacillating thoughts between killing and not killing himself and/or the victim) when the court found the allegation of premeditation to be "untrue."

Prejudice is defined as "a reasonable probability that a more favorable outcome would have resulted but for the ineffective counsel." *In re Cox* (2003) 30 Cal 4th 974, 1019; *Strickland v. Washington* (1984) 466 U.S. 668, 687. Petitioner has failed to show that his counsel's performance was deficient or that his trial was fundamentally unfair due to these perceived deficiencies. Accordingly, the claim is denied.

*Id.* at 5.

Later, the California Court of Appeal summarily denied Moore's habeas petition presumably raising the same IAC claims. Docket No. 12-21 at 2.[11] Moore then filed a state habeas petition in the California Supreme Court with an IAC claims section that is identical to the instant federal habeas petition. *See* Docket No. 12-22 at 51-81. The California Supreme Court summarily denied the petition. Docket No. 12-23 at 2.

This court looks through these unexplained decisions to the Marin County Superior Court's decision which was the last state court decision that provides a relevant rationale. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). The state superior court's decision is analyzed with the deference required by 28 U.S.C. § 2254(d) as to certain IAC claims, including the two IAC claims against his appointed attorney and the ten listed claims against his retained attorney. As to the remaining IAC claims, the California Supreme Court rejected those claims without explanation, and thus this court must independently review the state court record to determine whether there was any "reasonable basis for the state court to deny relief." *Harrington*, 562 U.S. at 98.

Moore contends that both trial counsel (his appointed and retained attorneys) provided ineffective assistance (sometimes referred to as "trial-IAC"). Docket No. 1 at 8, 51-69; Docket No. 1-1 at 1-12. He also claims that his appellate counsel provided ineffective assistance (sometimes referred to as "appellate-IAC"). Docket No. 1 at 9; Docket No. 1-1 at 5-6.

### 2.    Trial-IAC Claims Against Appointed Public Defender

Moore contends that his appointed attorney, Marin County Deputy Public Defender Ladell Dangerfield, was ineffective when (1) Attorney Dangerfield advised Moore to waive his right to a speedy trial and (2) when Attorney Dangerfield did not properly advise him of the consequences of

---

[11] Moore's state habeas petition filed in the California Court of Appeal has not been provided to the court, but the parties do not dispute that the same IAC claims were raised in that petition.

United States District Court
Northern District of California

testifying at the preliminary hearing.  Docket No. 1 at 51-52.

### a.       Speedy Trial

Moore elaborates on his first IAC claim against Attorney Dangerfield as follows:

> At the very first meeting with [Attorney] Dangerfield soon after defendant's arrest [Attorney] Dangerfield immediately told defendant that he was leaving for a ten day vacation in Hawaii.  Therefore, defense counsel waived defendant's constitutional right to a speedy trial.

Docket No. 1 at 51.  Moore provides no record citation for the alleged waiver.  *Id*.

The record shows that at Moore's first appearance on July 22, 2014, he appeared with Attorney Dangerfield for arraignment.  1CT 85; 1RT 4.  Attorney Dangerfield asked that arraignment be continued two weeks to August 5.  1RT 4.  Attorney Dangerfield told the court that he had discussed the matter with Moore, who agreed.  1RT 4.  Moore, who was present in court with Attorney Dangerfield, did not dispute Attorney Dangerfield's representations.  *Id*.

In rejecting this IAC claim, the state superior court reasonably found that Moore failed to demonstrate either of the elements under *Strickland* because the record showed that Moore had been "fully advised of his speedy *preliminary hearing* rights by the court, [but he] waived those rights." Docket No. 12-20 at 3 (emphasis added).  The state superior court did not address Moore's IAC claim as to how Attorney Dangerfield was ineffective for advising Moore to waive his speedy *trial* rights.  *See id*.  However, this court notes that as Moore had been arrested, but not yet held to answer, it is unclear whether his Sixth Amendment right to a speedy trial had attached.  *See Mann v. Beard*, 649 App'x 392, 392-93 (9th Cir. 2016).  Regardless, the state superior court likely chose not to address such a claim because there was no waiver of Moore's speedy *trial* rights, but rather a request for a two-week continuance of arraignment, to which Moore did not disagree.  *See* 1CT 85; 1RT 4.  Further, Moore made no effort to explain how the short continuance constituted ineffective assistance or prejudiced his case.  Docket No. 1 at 51.

To the extent that Moore's IAC claim could be construed as defense counsel rendered ineffective assistance by not litigating his statutory speedy trial rights, the record shows that no such motion was filed with the trial court raising any alleged violation of his speedy trial rights.  Thus,

Moore has forfeited his right to submit the federal constitutional claim for federal habeas review. *See Campodonico v. United States*, 222 F.2d 310, 316 (9th Cir. 1955), *cert. denied*, 350 U.S. 831 (1955) ("[t]he constitutional guaranty of a speedy trial is a personal right which may be waived by failure to assert it") (internal citation omitted); *see also People v. Blanchard*, 42 Cal. App. 4th 1842, 1849 (1996) (speedy trial claim cannot be asserted for first time on appeal or by petition for writ of habeas corpus). Moore cannot claim that counsel ineffectively assisted him in failing to litigate his federal constitutional speedy trial rights when he had an opportunity to do so himself and did not. *See United States v. Hall*, 181 F.3d 1057, 1060-61 (9th Cir. 1999) (where defense counsel does not assert his or her client's right to a speedy trial, a defendant may alert the court himself that he does not wish to waive those rights) (internal citation omitted). Therefore, Moore is not entitled to the writ on his first trial-IAC claim.

### b.   Preliminary Hearing

Moore contends that Attorney Dangerfield did not adequately prepare him for the preliminary hearing, and Moore claims he "did not know its purpose or his role in it." Docket No. 1 at 51. Moore acknowledges that Attorney Dangerfield advised him not to testify, but he did so anyway, "over counsel's objection." Docket No. 1 at 52; 1CT 53. Moore claims that after he testified, the prosecutor "added the charge of premeditated attempted murder, something that the utterly inexperienced and unprepared defendants could never have anticipated as even possible."[12] Docket No. 1 at 52. In essence, Moore claims that Attorney Dangerfield failed to sufficiently explain the ramifications of his decision to testify at the preliminary hearing and that he did not fully understand that his preliminary hearing testimony would harm him at trial. *Id.* at 50-52.

In rejecting this claim, the state superior court pointed out that Attorney Dangerfield "stated on the record that he was advising [Moore] not to testify." Docket No. 12-20 at 4. The court added

---

[12] The record shows that after the preliminary hearing, the prosecutor added attempted murder (count one), which included a further allegation that the attempted murder was committed willfully, deliberately, and with premeditation, within the meaning of California Penal Code § 664(a). 1CT 107. The defense filed a motion to set aside the information relating to the charge, but the trial court denied the motion. 1CT 143.

29

United States District Court
Northern District of California

that Moore "acknowledged this advice but chose to ignore it [and thus he] cannot now claim fault with the attorney." *Id.*

The state superior court's decision reasonably applied *Strickland*. Moore does not explain what exactly he needed to prepare him adequately for the preliminary hearing. Docket No. 1 at 51-52. Moore also acknowledges, as the state superior court pointed out, that counsel advised him not to testify, but Moore ignored counsel's advice. Docket No. 1 at 52; *see also* 1CT 53. The state superior court also reasonably found no prejudice would have resulted even if counsel's representation at the preliminary hearing was found to be ineffective because "the fact finder obviously considered his testimony (i.e., vacillating thoughts between killing and not killing himself and/or the victim) when the [trial] court found the allegation of premeditation to be 'untrue'." Docket No. 12-20 at 5; *see also* 10RT 547-548 (referring to the count one attempted murder premeditation and deliberation allegation pursuant to California Penal Code § 664(a)). Moore is not entitled to the writ on this claim.

### 3.    Trial-IAC Claims Against Retained Attorney

As mentioned above, after the preliminary hearing, Moore retained his own attorney, Charles Dresow, Esq. Moore claims Attorney Dresow was ineffective in numerous ways. The state superior court considered Moore's ten listed claims against Attorney Dresow but rejected them all together, as noted above, stating as follows: "[Moore] has failed however to present any evidence to suggest that [Attorney Dresow]'s work product was ineffective, fell below a reasonable standard or that he was prejudiced in any way." Docket No. 12-20 at 3-4. The California Supreme Court rejected the remaining IAC claims against Attorney Dresow without explanation, and thus the court must independently review the state court record to determine whether there was any "reasonable basis for the state court to deny relief." *Harrington*, 562 U.S. at 98.

#### a.    Alleged Failure to Prepare For Trial

Moore makes general allegations against his retained attorney, stating as follows:

> [Attorney] Dresow never interviewed [Moore] about facts or evidence in the case,
> despite having nearly a year to do so. Counsel never asked questions about
> prosecution evidence or investigated the case so as to locate evidence favorable for
> the defense. Counsel had no knowledge of significant details of the case and did not
> know when he examined [Moore] what answers to his questions would be.
> [Attorney] Dresow was totally unprepared to challenge, rebut or refute prosecution
> evidence including error, misperceptions of witnesses, or even outright lies.

Docket No. 1 at 53 (brackets added). Moore attempts to give the following examples below, but the state courts rejected them upon reasonably finding that none supported his trial-IAC claim.

i.      Failure to Challenge "Prosecution Testimony"

As support for his first trial-IAC claim against Attorney Dresow, Moore states: "See Exhibit 1-23 (a-r), prosecution testimony unchallenged." *Id.* Moore has attached to his petition as "Exhibit 1-23 (a-r)," pages from the victim's testimony, *see* Docket No. 1-3 at 25-44, 48-49, and pages from Attorney Dresow's closing argument, *see id.* at 45-47, 50-51.

The state superior court considered a similar claim when it denied two of Moore's ten listed claims against Attorney Dresow, including his retained attorney's alleged "failure to ask sufficient questions during trial," inability to be as "effective as the prosecutor," and lack of knowledge as to the "answers [Moore] was going to give at trial." Docket No. 12-20 at 4 (claims 1, 8). The state superior court reasonably applied *Strickland* upon finding that Moore had failed to present any evidence to suggest that Attorney Dresow's work product was "ineffective, fell below a reasonable standard or that he was prejudiced in any way." *Id.* at 5.

Upon independent review, this court also finds that the state supreme court reasonably rejected any remaining allegations that Attorney Dresow was totally unprepared to challenge, rebut or refute prosecution evidence. The record shows that such conclusory claims lack merit, including claims that Attorney Dresow did not raise any challenges to the victim's testimony. The record shows that counsel made multiple objections throughout the direct examination of the victim. *See* 8RT 52-72. Thus, the state supreme court could have reasonably found that Attorney Dresow did not engage in deficient performance and prejudice did not result.

ii.     Business Cards

Moore next asserts that Williams testified that Moore had "intimated that [Williams] was not giving out [Moore's business] cards and [Williams] was giving favoritism to someone else." Docket No. 1 at 53 (brackets added); *see* 8RT 167.  Moore asserts such testimony was untrue, and that he in fact wanted Williams to show favoritism only to Moore and only hand out his cards because of his relationship with the company and the "prior company's practice before Williams was hired as [a] salesman."  Docket No. 1 at 53.  The state supreme court summarily denied this claim.  Docket No. 12-23 at 2.

The record shows that Moore's and Williams's versions relating to the business card issue are not inconsistent.  As Williams explained, Moore was "not happy with the fact that he was in competition with somebody else," and Moore was "trying to may[be] guilt me into perhaps giving him favoritism."  8RT 167; *see also* 8RT 201 (testifying "it's clear that he expected me to give him priority over any other subcontractors.").

Even if there were inconsistencies, Moore fails to link such inconsistencies in Williams's testimony with some fault by counsel.  Moore asserts that such testimony was "unchallenged," *see* Docket No. 1 at 53, but it is unclear in light of the foregoing what there was to challenge. Furthermore, the record shows that Moore was able to testify about his version relating to the business card issue himself.  *See* 9RT 381, 407, 410, 426, 430.  In any event, the state supreme court acted reasonably in rejecting this claim because Moore failed to demonstrate any error or prejudice in Attorney Dresow's actions, or lack thereof, as to Williams's testimony relating to the business card issue.

iii.     Failure to Challenge Williams's Testimony Relating to Certain False Statements and Other Misstatements

Moore claims that his retained counsel failed to challenge certain false statements and misstatements by Williams.  Docket No. 1 at 54-58.  The state supreme court summarily denied this claim.  Docket No. 12-23 at 2.

First, Williams testified that long before the attempted murder, Moore had threatened to go

to Williams's business and "kick [his] ass" because Williams was not referring him plumbing jobs. 8RT 168-169, 200-201.  Moore denies making such a threat and asserts that counsel should have challenged Williams by asking him whether he had called 911 about the threat, or by asking the testifying sheriff's deputies whether they had received a call about the threat.  Docket No. 1 at 54. Despite Moore's contention, the state supreme court could have reasonably determined that counsel may have chosen not to object to Williams's statements about the alleged prior threat in order to avoid drawing undesired attention to them.  Williams did not suggest during testimony that he had called the police about the threat, and in fact stated that he did not take it seriously at first.  8RT 169-170.  Meanwhile, during Moore's testimony, he denied making such a threat.  9RT 381-382. The state supreme court could have determined that even if Attorney Dresow failed to challenge such statements, Moore fails to make any showing to overcome the presumption that the failure to object was a matter of trial strategy.  *See Morris v. Cal.*, 966 F.2d 448, 456 (9th Cir. 1991) ("[a]n attorney's failure to object to the admission of inadmissible evidence is not necessarily ineffective" but is presumed to be sound trial strategy which the movant must overcome); *People v. Williams*, 16 Cal. 4th 153, 221 (1997) (defense attorney's failure to object at trial rarely establishes ineffectiveness).

Second, Moore contends that counsel should have challenged Williams's "misperception" that Moore's "occasional body odor" was a result of him being homeless.  Docket No. 1 at 54; *see* 8RT 171.  Moore testified that while he was homeless he still bathed by various means.  Docket No. 1 at 54; *see* 9RT 410.  Moore suggests that he may have had body odor not because he did not bathe, but instead because by the time of day that Williams encountered him, he had been working and was sweaty.  Docket No. 1 at 54.  In denying this claim, the state supreme court could have concluded that Williams's "perception" as to why Moore had body odor was not relevant to any disputed issue and was explained by Moore in his testimony.

Third, Moore contends counsel should have "rebutted" the prosecutor's question for Williams that Moore had said "not handing out his card was a matter of life or death."  Docket No. 1 at 55.  Moore acknowledges that it was during his own testimony that "he actually said that he

needed work as a matter of life or death . . . ."  *Id.*; *see also* 9RT 381-382.  Meanwhile, Williams testified that he could not remember whether Moore had made the statement or not.  8RT 172.  Further, Moore testified to this point and explained the statement.  9RT 381-382, 406-407.  Therefore, the state supreme court reasonably rejected this claim because the only evidence concerning the statement came from Moore himself.

Fourth, Williams testified that Moore confronted him during the day of the incident about

> . . . how [Williams] had wronged [Moore] and how it was [Williams's] fault that [Moore] was going through all of the trouble that [Moore] went through and [Moore] was tired of it and [Moore was] going to kill [Williams] because [Williams was] worthless, or treated [Moore] wrong, and everything is [Williams's] fault for [Moore's] situation.

8RT 175-176 (brackets added).  In objecting to this testimony, Moore explains as follows: "Williams either lied or simply did not listen.  I never ever blamed him for my situation, but I asked him for help to save my life."  Docket No. 1 at 56.  Moore contends that counsel should have challenged Williams's statements but fails to explain what counsel should have done concerning the testimony which Moore disagrees with.  *See id.*  The state supreme court reasonably denied this claim because Moore does not suggest that any evidence could have been introduced to rebut these statements nor does he identify any questions counsel should have asked Williams.  Moore simply asserts in a conclusory manner that counsel "never advocated [his] truth on these matters."  *See id.*

In any event, the state supreme court reasonably rejected this IAC claim because Moore fails to make a showing that any objections to Williams's aforementioned testimony—assuming they would have been sustained—would have altered the outcome at trial.  *Cf. Jackson v. Brown*, 513 F.3d 1057, 1082 (9th Cir. 2008) ("[E]ven if [counsel's] failure to object was deficient, we cannot find that, but for his errors, there is a reasonable probability that the jury would not have still convicted [petitioner].").

As to the misstatements in Williams's testimony, Moore cites two statements that counsel could have used "to show [Williams's] state of mind and activity that reasonably would have caused him to mis-hear what Moore was saying."  Docket No. 1 at 57 (citing 8RT 178: 8-10 ("Q: At some point in time did you see [Moore's] demeanor change?  A: Well, I was talking pretty fast—"), 8RT

34

179:3-5 ("I'm sitting there shaking like a leaf, in a situation I've never been in my life, and my only thought was to get the hell out of there.")).  The state supreme court reasonably rejected this IAC claim because Moore offers no further explanation how counsel could have used the cited statements to show that Williams "mis-hear[d]" him.  *See id.*

Moore also cites as an alleged example of Williams's "misperception," Moore's true height of six feet zero inches versus Williams's estimate of six feet three inches.  Docket No. 1 at 57; *see* 8RT 180.  The state supreme court could have reasonably concluded that counsel determined that such a point was irrelevant and did not demonstrate any kind of substantial misperception.

Moore cites Williams's testimony regarding Williams's misstatements of Moore's words as he "was gesturing in an animated conversation from less than a foot away—not attempting to murder [Williams] by moving both hands around with a gun in one hand."  Docket No. 1 at 57; *see* 8RT 181-182 ("And [Moore] said, I'm going to put one in your shoulder and I'm going to put one in your knee, and I'm going to watch you suffer before I put one in your head."); 8RT 182 ("Well, when he was moving the gun around it wasn't constant.  It was part of the presentation when he was trying to drive home his threat, I guess is a way to put it.").  Moore asserts that such testimony could have been used to show that "[he] did not express a[n] idea that [he] was attempting to kill [Williams], but only gesturing."  Docket No. 1 at 57-58.  Moore fails to further elaborate on this point.  Upon considering the testimony above, the state supreme court could have reasonably rejected this claim upon finding that such testimony could not be used to show Moore was merely "gesturing" and that any attempt by counsel to object would be futile.  *See Rupe*, 93 F.3d at 1445 (failure to take futile action can never be deficient performance).

Lastly, Moore contends that counsel should have challenged the following portion of Williams's testimony:

> . . . I grew up around guns.  Anytime a gun is not dismembered and in somebody else's hand, even your uncle, you assume that gun is loaded.  Even if they hand it to you, then you take it apart, make sure it's not loaded.  So if a man stands out there and tells me he's going to kill me, has a gun in his hands, I believed it.

8RT 183.  Moore claims that counsel "never challenged [Williams's] absurd notion that growing up around guns enables someone to conclude that a person who stands in front of him with a gun in his

hands telling him he's going to kill him is believable."  Docket No. 1 at 58.  Moore simply adds, "Growing up around gun[s] does not enhance such a belief."  *Id.*  Again, aside from this conclusory statement, Moore does not explain what counsel should have done and offers no questions counsel should have asked to "challenge" such testimony.  The record shows that Moore's gun was in fact loaded, *see* 9RT 353, and in these statements at issue Williams was explaining why he believed Moore when Moore threatened to kill him, *see* 8RT 183.  The state supreme court could have reasonably determined that Moore did not meet his burden to show how counsel's failure to challenge this portion of Williams's testimony resulted in error or prejudice.

### b.  Weak Defense and Broad Criticism of Counsel

Moore alleges that Attorney Dresow "weakly" argued for reasonable doubt, while the prosecutor advocated her case in "point by point detail."  Docket No. 1 at 58.  Moore also makes broad criticism of counsel by stating that counsel "chose not to rebut . . . or provide an effective adversarial defense [and] Prosecutor Frugoli was just the opposite—a fierce advocate . . . ."  *Id.* at 64.  The state superior court rejected similar claims of Attorney Dresow's weak defense and reasonably applied *Strickland* in finding that Moore "failed to present any evidence to suggest that [Attorney Dresow's] work product was ineffective, fell below a reasonable standard or that he was prejudiced in any way."  Docket No. 12-20 at 4-5 (claim 1).  And the state supreme court could have reasonably denied this IAC claim as too broad and lacking specificity.  Docket No. 12-23 at 2.  Furthermore, Moore describes nothing more than different styles used by trial counsel and the prosecution.  *Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003) (per curiam) (counsel has wide latitude in electing how to present closing argument); *see Strickland*, 466 U.S. at 689 ("There are countless ways to provide effective assistance in any given case.  Even the best criminal defense attorneys would not defend a particular client in the same way.").  Thus, the state superior and supreme courts reasonably rejected these claims (relating to a weak defense or any board criticisms of counsel) because Moore failed to demonstrate how the difference in style used by trial counsel and the prosecution amounted to ineffective assistance.

Moore next asserts that "[c]ounsel never developed the defense['s] truth that [Williams] in all his testimony . . . ever said[,] 'Please do not kill me' or any other direct, obvious statement that caused [Moore] to perceive that [Williams] was begging for his life." Docket No. 1 at 64-65. Moore claims that the [defense's] truth is that he (Moore) never perceived Williams to beg for his life, but perceived Williams as taunting him by continuing to insist on the same manner of passing out his business cards that Moore objected to. *Id.* at 65. Moore purports to further explain, but his point is not clear beyond concluding that counsel "never discussed these details with [Moore] at any time and so [counsel] did not advocate [Moore's] truth in court." *Id*. Moore fails to explain how his "truth" as stated here, *see id.*, helped his defense. Regardless, the state supreme court reasonably rejected this claim. Docket No. 12-23 at 2. The record shows that Moore testified at the preliminary hearing and at trial, *see* 2CT 342-361 (preliminary hearing testimony); *see also* 9RT 366-446 (trial testimony). and Moore does not allege that he was precluded from testifying about his "truth," or that any part of his "truth" failed to make it onto the record.

Finally, Moore claims that "counsel never fully investigated the case," and because counsel did not speak with him before the trial, counsel did not "know or locate witnesses who could prove [Moore's] truth that he routinely had difficulty making decisions of all kinds." *Id.* at 65-66. This claim mirrors one of the ten listed claim Moore raised in the state superior court dealing with counsel's "fail[ure] to call friends who would say that he routinely had a hard time making decisions." Docket No. 12-20 at 4 (claim 5). Moore neglects to attribute this fact to a failure on the part of his counsel which resulted in prejudicial error. He also does not explain who these witnesses are and how this information would have helped his defense. Without such information, the state superior court reasonably applied *Strickland* in rejecting this claim. *See id.* at 4-5.

As to any other allegations criticizing counsel, i.e., any claims that Attorney Dresow failed to locate evidence favorable to the defense or was totally unprepared to challenge prosecution's evidence, such allegations were likely denied summarily by the state supreme court as entirely speculative. Docket No. 12-23 at 2. Moore does not delineate what particular evidence/challenge should or should not have been elicited, or how the admission and/or failure to present such

United States District Court
Northern District of California

evidence/challenge prejudiced him at trial.  But even if there were such favorable evidence, Moore's suggestion that the fact finder would have weighed that information more heavily than the inculpatory evidence presented at trial is entirely speculative.  *See Gonzalez v. Knowles*, 515 F.3d 1006, 1016 (9th Cir. 2008) (holding that speculation regarding the impact an investigation into the defendant's mental health condition would have had at sentencing was "plainly insufficient to establish prejudice" under *Strickland*).  Mere speculation is not sufficient to meet the burden under *Strickland* and thus the state supreme court reasonably rejected this claim.  *Id.*

Lastly, in Moore's declaration attached to his petition he claims that counsel "ignored . . . a trial theme [Moore] composed for the defense, 'All is not as it appears'".  Docket No. 1 at 32.  This claim mirrors one he raised in the state superior court: "Counsel failed to adopt the trial theme proffered by petitioner titled "All is Not as it Appears."  Docket No. 12-20 at 4 (claim 10).  Ignoring a trial theme proposed by a client only amounts to a difference of opinion, which does not equate to ineffective assistance of counsel.  *See Mayo*, 646 F.2d at 375 (holding that a difference of opinion as to trial tactics does not constitute denial of effective assistance).  The state superior court reasonably applied *Strickland* in reaching the same conclusion when rejecting this claim, stating as follows: "Although [Attorney Dresow] did not do what [Moore] wanted him . . . to do, this does not mean that [Attorney Dresow was] ineffective.  [Moore] simply claims that [Attorney Dresow] should have done things differently."  Docket No. 12-20 at 4-5 (brackets added).

c.    Withheld Discovery

Moore contends counsel "never shared pre-trial discovery with [him]," and asserts as follows:

> Assistant [Defense] Counsel Steve Juliani told [Moore] one day that the prosecution had recorded an incriminating statement by [Moore] during a visit by customer Susan Crochette.  But counsel never shared the recording, or any transcript or even any description of such a comment with [Moore].

Docket No. 1 at 59.  The state supreme court summarily denied this claim.  Docket No. 12-23 at 2.

Even assuming Moore's assertions are correct, the state supreme court could have reasonably determined that they do not establish error.  First, other than the single statement referenced above,

United States District Court
Northern District of California

Moore does not elaborate on what other pre-trial discovery was kept from him or explain why the alleged failure to share such discovery with him constituted ineffective assistance by Attorney Dresow.  Assuming the incriminating statement existed, there is nothing in the record showing that such a statement was introduced at trial.  Thus, the state supreme court could have determined that Moore failed to meet his burden of showing error or prejudice from counsel's alleged withholding of this statement from him.

### d.    Failed to Review Favorable Evidence

Moore alleges that counsel "never reviewed in court prosecution evidence that was actually favorable to [him] or had the favorable comments put into the transcript instead of labeled as exhibits."  Docket No. 1 at 59 (citing Docket No. 1-2 at 17-20).  Moore claims that these exhibits, which are letters he wrote to London Chimney Services owner Mark Rizzo and to Ms. Snyder, "contained statements of remorse, apology, and even an offering of friendship."  *Id.*  The state supreme court reasonably rejected this claim because Moore's conclusory assertion (that favorable evidence was not reviewed) does not meet his burden under *Strickland.*  Docket No. 12-23 at 2.  In addition, his claim is unsupported as Moore acknowledges that such evidence was introduced by Attorney Dresow into evidence but complains that counsel "put them into the transcript instead of labeled as exhibits."  *Id.*  Introducing favorable evidence into the transcript through testimony as opposed to labeling them as exhibits does not render them of lesser importance.  Both methods lead to the introduction of the evidence, and in this case, the record shows such statements were introduced as evidence when Moore testified about the letters.  9RT 392-393.

### e.    Failure to Emphasize How the Victim's Testimony Negated the Prosecution's Claim of Attempted Murder

Moore asserts that counsel "did not emphasize that [Williams's] testimony negated logically the prosecution's claim of attempted murder."  Docket No. 1 at 59 (citing 8RT 209).  Moore proffers no further explanation, and instead he cites to Williams' testimony, which states as follows: "Q: Would it be fair to say that both of Mr. Moore's hands were moving around, both the hand that

held the firearm and the empty hand.  A: That's correct."  8RT 209.  This assertion appears to relate to the previous contention above that Williams's testimony supported Moore's claim that he was not waiving a gun around but instead gesturing with it.  *See supra* DICUSSION Part C.3.a.iii. However, again, Moore fails to further elaborate on this point.  In summarily denying this claim, the state supreme court could have reasonably determined that it was unclear how the difference between waiving and gesturing with a gun logically negated the claim of attempted murder.  Docket No. 12-23 at 2.  Thus, any attempt by counsel to emphasize Williams' above testimony would be futile, and the failure to take such futile action does not amount to ineffective assistance.  *See Rupe*, 93 F.3d at 1444-45.

### f.    Contracted Moore's Testimony

Moore contends that Attorney Dresow "actually contradicted his testimony."  Docket No. 1 at 60.  In support of his claim, Moore cites two portions from the record: "9RT 397:7-9" (his testimony) and "9RT 511:26-512:1" (Attorney Dresow's closing statement).  Docket No. 1 at 60. Moore states that he testified that he was "sitting in [his] truck and [Williams] approached [him]. [Moore] didn't call hi[m] over, but [Williams] approached [him] and [they] had that conversation." 9RT 397.  Meanwhile, counsel at closing stated as follows: ". . . the first time [Williams] saw the gun it was in [Moore's] lap when [Williams] approached, or was called over to the—to the truck." 9RT 511-512.  Moore further explains how these two statements contradict by stating as follows:

> This issue was critically important because [Moore] never intended to speak with [Williams], did not want to talk to [Williams] that day and only spoke to [Williams] because [Williams] spoke to him first and asked what [Moore] was doing there.

Docket No. 1 at 60.  Even if these two statements were contradictory, it seems that Moore neglects to quote the remainder of counsel's closing statement, which indicate that counsel's other arguments do *not* contradict Moore's defense, i.e., that he did not intend to kill Williams:

> And at that stage the weapon was never pointed at [Williams].  It was displayed.  It was a rusty old gun.  Then [Williams] recalls that at some point, even in his own testimony, that [Moore] told him in some form of words, I'm not—I'm not going to kill you today.  [Williams] obviously testifies he heard I am going to kill you, numerous times, but Mr. Moore did tell him that he wasn't—that he wasn't going to do it that day.

9RT 512.  Thus, the state supreme court could have reasonably determined that the record does not support Moore's claim that counsel's performance was deficient or that he suffered any prejudice as a result of counsel's *single* contradictory statement at closing.

This portion of this claim challenging counsel's closing statement seems to mirror one of the ten listed claims he raised in the state superior court: "Counsel refused to use (or acknowledge) the opening and closing statements written for him by [Moore]."  Docket No. 12-20 at 4 (claim 9).  As mentioned, the state superior court denied this claim stating that while Moore was "unhappy with counsel's representation," any challenges to counsel's closing fail to "support a finding that counsel's performance fell below a standard of reasonableness."  *Id.*  Therefore, there is no basis for concluding that the state superior court unreasonably applied *Strickland* here.

### g.     Failure to Object to Misleading Prosecution Video

Moore alleges counsel allowed the prosecutor to present a misleading video.  Docket No. 1 at 60.  He explains that Deputy Richardson's video demonstrating the functionality of the gun was "unnecessary under law to prove the gun was loaded and which showed the firearm expert firing the weapon in a way that [Moore] would not have been able to."  *Id.*  Moore does not explain how the video could have been excluded.  This particular claim is similar to one of the ten listed claims he raised in the state superior court: "Counsel allowed the prosecutor to present misleading arguments."  Docket No. 12-20 at 4 (claim 2).  The state superior court denied this claim upon finding that it did not support a finding that Attorney Dresow's performance fell below a standard of reasonableness or that Moore was prejudiced in any way.  *Id.* at 4-5.

The record shows that the video did not purport to reflect Moore's actions, and instead, it was used to show that the gun was operable.  *See* 8RT 156-157, 296, 308-317.  Thus, it seems that Moore again misapprehends the purpose of the video, as the court has found above.  *See supra* DISCUSSION B.2.a.vi.  Therefore, the state superior court reasonably applied *Strickland* in rejecting this claim because Moore failed to show error or prejudice.

To the extent that this IAC claim could be broadened to include Moore's allegations that the

United States District Court
Northern District of California

gun was previously tested and was not operable, and that counsel was ineffective in failing to call "his own gun expert" to provide a video showing the gun was not operable, such a claim also fails. Docket No. 1 at 33-35.  This claim mirrors one of the ten listed claims Moore raised in the state superior court: "Counsel failed to provide an adequate gun expert, with a prepared video to show how the gun was not working properly."  Docket No. 12-20 at 4 (claim 6).  In rejecting this IAC claim, the state superior court could have reasonably concluded that any such efforts by counsel would be futile, *see Rupe*, 93 F.3d at 1445, because evidence was introduced at trial showing the gun was in fact operable, *see* 8RT 156-157, 296, 306, 308-317, and Moore fails to provide evidence to the contrary.

### h.    Failure to Note Williams's Delay in Filing His Report

Moore argues counsel "never made [a] note at trial that [Williams] was given 2 days after the incident in which to file his report [to police] by email."  Docket No. 1 at 61 (citing Docket No. 1-2 at 27-28).  Moore claims that "such a delay could have been used by law enforcement and/or the prosecution to shape Williams's perceptions with [Moore's] 'Final Thoughts' [Facebook post] or other evidence already in possession."  *Id.*  Moore has attached the police report dated July 22, 2014, which includes Williams's "written statement."  *See* Docket No. 1-2 at 27-28.  However, Moore fails to explain what exactly Williams could have gleaned from Moore's "final thoughts" Facebook post, and Moore does not elaborate on how that post or any of the unspecified "other evidence" could have affected Williams's statement.  *See id.*  The state supreme court summarily rejected this claim.  Docket No. 12-23 at 2.

It seems that Moore is speculating about what could have occurred during Williams's delay in writing his statement, but such speculation does not amount to error by counsel.  *See Gonzalez*, 515 F.3d at 1016.  Thus, the state supreme court reasonably rejected this claim because Moore neither shows error nor prejudice.

United States District Court
Northern District of California

i.      Failure to Introduce Expert Testimony of Neuropsychologist at Trial

Moore notes that counsel hired a "neuropsychologist" named Christine Naber, Ph.D., to evaluate Moore, but Moore now faults counsel for "fail[ing] to use Dr. Naber's favorable report at trial [and] in analyzing [Moore's] neurological impairment after a stroke in 2011 which impaired [Moore's] ability to form intent, an element of the crime of attempted murder."  Docket No. 1 at 61 (citing Docket No. 1-2 at 29-34).  Moore also claims that "Dr. Naber's report also could have provided benefit to the defense in explaining why [Moore] could not perceive [Williams's] distress." *Id.*  Moore adds as follows: "Counsel's failure to use this report was inexplicable [as] Dr. Naber's report also should have been used and referred to in countering a prior diagnosis by Psychologist Dr. Paul Goode of narcissism, which [the prosecutor] argued at sentencing justified a maximum sentence for [Moore]."  *Id.* at 61-62.  In support of this claim, Moore provides six selected, non-consecutive pages from Dr. Naber's twenty-page report.  *See* Docket No. 1-2 at 29-34.

The state superior court considered this claim as one of the ten listed claims, *see* Docket No. 12-20 at 4 (claim 7), and it reasonably applied *Strickland* when it construed counsel's decision not to introduce Dr. Naber's report as a strategic or tactical matter, *see id* at 4-5.  Such a decision is entitled to substantial deference.  *See Turner v. Calderon*, 281 F.3d 851, 876 (9th Cir. 2002) ("The choice of what type of expert to use is one of trial strategy and deserves 'a heavy measure of deference.'"); *Wiggins v. Smith*, 539 U.S. 510, 523 (2003) (holding that evidence that the challenged trial conduct resulted from inattention rather than from strategic considerations may also be relevant to the inquiry of whether a decision was a tactical one).  While Moore may believe that counsel should have introduced Dr. Naber's report, a mere difference of opinion is insufficient to establish an IAC claim.  *See Mayo*, 646 F.2d at 375; *see also Bashor*, 730 F.2d at 1241.

As the Supreme Court recently explained in *Dunn v. Reeves*, a state court is "entitled to reject [a defendant's] claim if trial counsel had any 'possible reason for proceeding as they did.'"  *See* 141 S. Ct. at 2412 (quoting *Pinholster*, 563 U.S. at 196 (alterations omitted)).  Here, counsel could have had various reasonable grounds for not putting a mental health expert on the stand.  Counsel could have concluded that there were adverse findings—e.g., Dr. Goode found that Moore exhibited

narcissism "indicative of arrogance and entitlement"[13]—that would feed directly into the prosecution's case and might counter-balance any benefits such an expert might provide. *See Stanley v. Schriro*, 598 F.3d 612, 636 (9th Cir. 2010) ("Capable lawyers evaluate not only what they ought to do, but what they ought not to do.  Where action on behalf of a client has a considerable likelihood of backfiring, they avoid it.").  What, if any, additional adverse findings exist is unclear due to the lack of a proffer by Moore of what Dr. Naber's testimony would be, but "[i]t should go without saying that the absence of evidence cannot overcome the 'strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance.'" *See Burt v. Titlow*, 571 U.S. 12, 23 (2013) (quoting *Strickland*, 466 U.S. at 689) (brackets in *Titlow*).  Moreover, "[f]ew decisions a lawyer makes draw so heavily on professional judgment as whether or not to proffer a witness at trial." *Lord v. Wood*, 184 F.3d 1083, 1095 (9th Cir. 1999).

The state superior court could have also rejected this claim because counsel may have acknowledged the limits of an expert in this context. *See* Docket No. 12-20 at 4-5.  Under California law, evidence of a mental disease or defect "shall not be admitted to show or negate the capacity to form a mental state."  Cal. Penal Code § 28(a).  Rather, such evidence is only admissible on the question "whether the accused actually formed" a required intent.  *Id*.  To prove that Moore committed attempted murder, the prosecution had to prove that (1) Moore "took at least one direct but ineffective step toward killing another person," and (2) "intended to kill that person."  2CT 479.  Thus, Moore would have had to produce an expert to opine that he did *not* in fact form an intent to kill.  As discussed, he has made no such proffer, and even assuming he had, counsel could have reasonably determined that it would have been an ineffectual defense on this record, considering Moore's acknowledgment that he had long contemplated killing Williams (*see Moore*, 2018 WL 1417911, at *3), his "final thoughts" Facebook post before the offense (1CT 268-69), his statement during the 911 call (2CT 362-67), and his preliminary hearing testimony (2CT 342-361), all of which consistently countered any suggestion that Moore did not form an intent to kill.

---

[13] Though the narcissism finding was apparently made by Dr. Goode, his report would have been admitted had Dr. Naber testified, as she reviewed it in reaching her opinion.  *See* Docket No. 1-2 at 29-30 (Dr. Naber's report).

United States District Court
Northern District of California

Accordingly, as the record shows counsel did not have a particularly strong reason to introduce Dr. Naber's report or her expert testimony, this court cannot find that "every 'fairminded juris[t]' would agree that every reasonable lawyer would have made a different decision." *Dunn*, 141 S. Ct. at 2411 (quoting *Harrington*, 562 U.S. at 101).

### j. Waiver of Jury Trial

Moore claims counsel "never discussed with [him] the pros and cons of waiving the right to a jury trial and having a bench trial." Docket No. 1 at 62. However, Moore does not elaborate further on this claim. *See id.* Rather, Moore alleges that counsel "had told [Moore] that Judge Simmons was the 'fairest judge in the county' and that changing judges in order to avoid a delay due to Judge Simmons would mean that [Moore] would have to find a new attorney." *Id.* Moore then points to a "publicized case where counsel Dresow was able to have charges dropped against a prior client who shot a citizen and was charged with attempted murder." *Id.* It seems that Moore speculates as to possible corruption by stating as follows: "Was [Attorney Dresow's] very weak and ineffective assistance in my trial return of some sort of favor on behalf of another client." *Id.* Moore also fails to allege any error or suggest he would have preferred a jury trial. *Id.* This claim is similar to one of the ten listed claims he raised in the state superior court, which states as follows: "Counsel convinced [Moore] to waive jury even though other attorneys suggested otherwise." Docket No. 12-20 at 4 (claim 3).

The record shows that the option of a bench trial came first from Moore himself and arose at least in part out of his interest in moving the case along. *See* 7RT 107-113. Counsel indicated on the record that he would speak with Moore and advise him on the issue before a final decision was reached. 7RT 111. At a subsequent appearance, Moore waived his right to a jury trial following a colloquy by trial counsel, in which, *inter alia*, Moore acknowledged that he had discussed his right to a jury and the consequence of waiving that right with counsel. 8RT 120-124. Thus, the state superior court reasonably applied *Strickland* in rejecting this claim because Moore shows neither error by counsel nor prejudice, and that court could have reasonably found that Moore knowingly

1    and willingly came to the decision to waive his jury trial on his own.  *See* Docket No. 12-20 at 4-5.

2

3                            k.    Failure to Contact Character Witnesses

4           Moore contends counsel "failed to contact any character witnesses for the trial despite

5    requests from [Moore] to do so."  Docket No. 1 at 63.  He fails to explain how such witnesses could

6    have been used to defend any element of the offense.  *Id.*  Moore speculates that the people who

7    wrote letters to the court for sentencing would also testify on his behalf at trial. *Id.*  However, he

8    does not name any of these "character witnesses," nor does he explain what these witnesses would

9    say. *Id.*  Moore broadly concludes that counsel "failed to mention any of the letters in court, or even

10   make a serious advocacy for [him] at the sentencing hearing."  *Id.*    However, Moore does not

11   elaborate on any specific error or prejudice by counsel at the sentencing hearing.  Instead, Moore

12   acknowledged that "counsel filed a sheet of papers labeled as a mitigation package," presumably

13   during the sentencing hearing. *Id.*

14          This claim matches one of the ten listed claims raised in the state superior court dealing with

15   counsel's "fail[ure] to bring character witnesses to testify on [Moore's] behalf."  Docket No. 12-20

16   at 4 (claim 4).  In denying this claim, the state superior court likely reasonably construed counsel's

17   decision not to call character witnesses as a tactical decision, *see id.* at 4-5, which is not reviewable

18   in a federal habeas action, *see Strickland*, 466 U.S. at 690 (reasonable, strategic choices by counsel

19   such as this are "virtually unchallengeable" on federal habeas corpus review); *Matylinsky v. Budge*,

20   577 F.3d 1083, 1091 (9th Cir. 2009) (the court may "neither second-guess counsel's decisions, nor

21   apply the fabled twenty-twenty vision of hindsight . . . .").  The state superior court could have also

22   determined that counsel may have reasonably concluded that, considering the issues in dispute,

23   "character witnesses" would not be helpful.  Specifically, as mentioned above, Moore fails to

24   explain how these "character witnesses" could have been used to defend any particular element of

25   the offense, considering the prosecution's evidence.  For example, if Moore wanted "character

26   witnesses" to testify he was nonviolent, he has failed to explain how such testimony would have

27   been effective in light of his actions, i.e., his thoughts of killing Williams, and confrontation with

28

United States District Court
Northern District of California

1    Williams at the scene while armed with a loaded handgun.  Therefore, the state superior court

2    reasonably applied *Strickland* in rejecting this claim.  *See* Docket No. 12-20 at 4-5.

3

4                    l.        Failure to Resolve "Logical Inconsistency" About Murder-Suicide

5            Moore claims counsel "never dealt with the logical inconsistency of the prosecution['s]

6    claims that Williams talked [Moore] out of killing him (Williams) but Williams never attempted to

7    talk [Moore] out of killing himself."  Docket No. 1 at 63.  Such a logical inconsistency does not

8    seem apparent in the record, but even if it was, Moore does not explain what counsel should have

9    done to account for this discrepancy.  Moore adds that counsel should have also pointed out that

10   "[Moore] prayed at the scene and decided not to kill or to die—so Williams was not at risk at all."

11   *Id.*  However, the state superior court could have found that such an argument was not one that

12   competent counsel would have made.  *Cf. Dunn*, 141 S. Ct. at 2410 ("[E]ven if there is reason to

13   think that counsel's conduct 'was far from exemplary,' a court still may not grant relief if '[t]he

14   record does not reveal' that counsel took an approach that no competent lawyer would have

15   chosen.") (citation omitted).  Thus, the state supreme court reasonably rejected this claim because

16   Moore fails to show error or prejudice.

17

18                    m.        Suicide Note ("Final Thoughts" Facebook Post)

19           Moore further contends counsel did not advocate the "additional truth of why [Moore] sent

20   out a seeming suicide note before going to [Williams's] location" in the form of Moore's "final

21   thoughts" Facebook post.  Docket No. 1 at 67.  Moore explains that his "truth" was that he had not

22   made a decision to kill himself or Williams.  *Id*.  Yet the record shows that Moore testified about

23   his reasoning for making the Facebook post.  9RT 373-376; *see also* 9RT 397-398, 417-418, 437

24   (cross-examination).  While Moore's explanation during his testimony was not exactly what he

25   presents in his petition, it was similar, and he fails to explain how any discrepancy could be the fault

26   of counsel.  Rather, Moore asserts counsel did not "advocate" the explanation that Moore alleges

27   here.  The state supreme court summarily denied this claim.  Docket No. 12-23 at 2.

28

United States District Court
Northern District of California

To the extent Moore contends counsel did not argue the distinction between Moore *thinking* about killing Williams and *deciding* to kill Williams, Moore is incorrect as the record shows that counsel made such an argument.  *See* 9RT 512-513 (counsel arguing during closing that facts did not support contention that Moore formed specific intent to kill Williams because he never made decision to say, "I'm going to go there and kill [Williams] that day.").  In sum, Moore's claim is baseless, and the state supreme court could have reasonably determined that Moore did not meet his burden to show how counsel's failure to "advocate for the additional truth"—relating to why Moore made the "final thoughts" Facebook post—resulted in error or prejudice.

n.     Failure to Advocate the "Truth" of Moore's 911 Call

Moore contends counsel never advocated Moore's "truth" regarding his 911 call, which was that "his behavior of dialing 911 with no indication that [Williams] would do the same was [a] clear indication of [a] lack of criminal guilt combined with an exceptionally sensitive conscience concerning unhealthy thoughts that [Moore] was concerned about."  Docket No. 1 at 69; Docket No. 1-1 at 1, 6.  Moore claims that he testified that "his prayer led to a good decision and his 911 call was not a confession of guilt but an attempt to seek help and account for his real thoughts and actions."  Docket No. 1-1 at 1.  The state supreme court summarily denied this claim.  Docket No. 12-23 at 2.

Contrary to Moore's assertion, the record shows that counsel asked Moore about the 911 call, and also asked him why he made the call.  9RT 386-388; *see also* 9RT 424-425 (cross-examination); 9RT 511, 517-518 (argument).  Counsel also reemphasized that Moore explained what he meant in his 911 call during his direct examination.  9RT 511, 517-518.  To the extent that Moore's explanation or "truth" regarding the 911 call has changed, he fails to specify how counsel is at fault for any such change.  In any event, the state supreme court could have found that counsel was not ineffective for any failure to advocate for Moore's "truth" of his 911 call because the most important evidence on the subject was the transcript of the 911 call itself.  *See* 2CT 362-367 (transcript of 911 call).  Therefore, the state supreme court reasonably rejected this claim because

United States District Court
Northern District of California

1    Moore fails to explain how counsel erred or to show that any prejudice resulted.

2

3                    o.       Failure to Investigate Helen Snyder

4         Moore contends counsel did not investigate Ms. Snyder,[14] "who interjected herself . . . from

5    afar and provided information to the prosecutor, the judge, and who ever contacted [Williams]."

6    Docket No. 1-1 at 1.  Moore claims that Ms. Snyder is "extremely biased against [him] . . . ."  *Id.*

7    Thus, it seems that Moore claims that counsel failed to impeach Ms. Snyder as biased against Moore.

8    *Id.* at 1-3.  The state supreme court rejected this claim in a summary denial.  Docket No. 12-23 at 2.

9         The record shows that Ms. Snyder did not testify at Moore's trial.  *See* 8RT 131, 144-148.

10   Rather, the prosecutor asked Moore about having posted a comment on Facebook stating that Ms.

11   Snyder, "was a sister in the raptor community[15] [who was] trying to cause [Moore] grievous harm

12   from afar while [he was] in jail."  9RT 392-394.  The post was apparently in response to Ms. Snyder

13   having forwarded Moore's "final thoughts" Facebook post to police out of concern.  9RT 394-398.

14   Neither Ms. Snyder's note to police nor Moore's Facebook post was introduced into evidence.  9RT

15   499-500.  Moore's testimony on the subject was limited, as most of counsel's objections on the

16   subject were sustained.  9RT 394-398.  In any event, Moore was allowed to explain why he sent the

17   response to Ms. Snyder.  9RT 394-398.  Moore does not explain what evidence was available (or

18   admissible) to impeach Ms. Snyder as a non-testifying witness.  The state supreme court reasonably

19   rejected this claim because Moore fails to show error or prejudice in counsel's purported failure to

20   investigate Ms. Snyder.

21

22                   p.       Failure to Investigate Williams and Introduce His Bad Reviews

23        Moore contends counsel did not investigate and present evidence as to Williams's character

24

25   _____

26        [14] *See supra* at 19 fn. 6 (regarding Ms. Snyder).

27        [15] In Moore's letter to Ms. Snyder, he mentions both of their involvement in the "raptor research community," specifically to Ms. Snyder as a "raptor bander and researcher."  Docket No. 1-2 at 19-20.  Moore testified at length that he has a "serious avocation" studying raptors, such as
28   hawks and owls.  9RT 367.

                                              49

and manner of dealing with people.  Docket No. 1-1 at 3.  Moore asserts counsel failed to gather "bad reviews" online of Williams.  *Id.*  Moore points out that Williams "is a[n] unsalaried salesman paid on commission only and treats customers well only if he senses an imminent sale and a commission for himself."  *Id.*  Moore points to no admissible evidence concerning Williams and fails even to allege a relevant character trait of Williams that counsel should have investigated.  *See id.* at 3-4.  Moore's allegation that Williams is only interested in sales rather than genuinely interested in his customers is speculative.  Thus, the state supreme court reasonably rejected this claim because Moore fails to allege error or prejudice in counsel's actions.

q.  Failure to Investigate Moore

Lastly, Moore makes a broad allegation that counsel "never investigated [Moore] himself." Docket No. 1-1 at 4.  Moore asserts that that he did business with various fireplace stores, that his downturn was a "byproduct of few referrals from many sources," and that blaming Williams for Moore being homeless would have been "nonsensical."  *Id.*  The record shows that Moore was angry at Williams for refusing to refer customers to him exclusively, and that he had long wanted to harm or even kill Williams over it.  9RT 430-432; 8RT 167, 201; *see also Moore*, 2018 WL 1417911, at *2-3.  Regardless, Moore testified and was given the opportunity to explain who or what he blamed and why.  9RT 366-446.  The state supreme court reasonably rejected this claim because no error or prejudice resulted from any alleged failure by counsel to investigate Moore.

r.  Summary

Because there is no basis for concluding that either the state superior court unreasonably applied *Strickland* in its reasoned denial or the state supreme court acted unreasonably in issuing its summary denial, Moore is not entitled to a writ on his trial-IAC claims against Attorney Dresow.

4.  Appellate-IAC Claims Against Attorney Derham

The Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant the

United States District Court
Northern District of California

right to effective assistance of counsel on his first appeal as of right. *See Evitts v. Lucey*, 469 U.S. 387, 391-405 (1985). Claims of ineffective assistance of appellate counsel are reviewed according to the standard set out in *Strickland*. *See Smith v. Robbins*, 528 U.S. 259, 285 (2000). First, the petitioner must show that counsel's performance was objectively unreasonable, which in the appellate context requires the petitioner to demonstrate that counsel acted unreasonably in failing to discover and brief a merit-worthy issue. *Id.*; *Moormann v. Ryan*, 628 F.3d 1102, 1106 (9th Cir. 2010). Second, the petitioner must show prejudice, which in this context means that the petitioner must demonstrate a reasonable probability that, but for appellate counsel's failure to raise the issue, the petitioner would have prevailed in his appeal. *Smith*, 528 U.S. at 285-86; *Moormann*, 628 F.3d at 1106. Appellate counsel does not have a constitutional duty to raise every nonfrivolous issue requested by a defendant. *See Jones v. Barnes*, 463 U.S. 745, 751-54 (1983). The weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy. *See Jones*, 463 U.S. at 751-52.

Moore contends that his appellate counsel, Robert Derham, Esq., "refused to argue for a new trial claiming that he did not receive funding to investigate the issues involved, [and] he advised [Moore] to file a habeas petition after the direct appeal was over." Docket No. 1-1 at 5. The state supreme court summarily denied this claim. Docket No. 12-23 at 2. The state supreme court could have determined that such comments do not allege error as it seems that Attorney Derham was merely explaining that he had not received funding to pursue collateral review.

Moore also contends Attorney Derham "failed to use textual language of a cited case shared with him by [Moore] that countered the argument of the appe[llate] court to deny the direct appeal." Docket No. 1-1 at 5. Moore declines to share the name of this case. *Id.* In any event, the state supreme court reasonably rejected such a claim because it is appropriate for appellate counsel to present only the strongest claims (including supporting caselaw), and Attorney Derham could have made the decision not to rely on that case from Moore.

Accordingly, Moore is not entitled to the writ on his appellate-IAC claims.

United States District Court
Northern District of California

5.      Trial-and-Appellate-IAC Claims

Finally, Moore alleges IAC claims against his trial (Attorneys Dangerfield and Dresow) and appellate counsel (Attorney Derham).  The state supreme court summarily rejected such claims.  Docket No. 12-23 at 2.

First, Moore asserts that Attorney Dresow "failed to discuss possible grounds for appeal after trial with [Moore] and never discussed grounds for appeal with [appellate counsel]."  Docket No. 1-1 at 6.  Moore does not identify any grounds for appeal about which trial counsel should have informed appellate counsel.  *See id.*  Moore likewise does not identify any grounds for appeal that appellate counsel should have raised but did not.  *See id.*  Beyond the unspecific conclusory allegations above, Moore does not identify any failing by appellate counsel to raise a particular claim on appeal.  As such, the state supreme court could have reasonably determined that neither trial nor appellate counsel engaged in deficient performance and prejudice.

Moore again contends that neither his trial nor his appellate counsel advocated for his "truth" relating to his 911 call.  Docket No. 1-1 at 6.  As discussed in an identical claim against Attorney Dresow above, *see supra* DISCUSSION C.3.n., the state supreme court could have also found that neither his trial nor appellate counsel was ineffective for any failure to advocate for Moore's "truth" relating to his 911 call because the transcript of the call speaks for itself, *see* 2CT 362-367.  The state supreme court reasonably rejected this claim because Moore fails to show error or prejudice.

Accordingly, Moore is not entitled to the writ on his IAC claims against both trial and appellate counsel.

D.   Claim 4 - Newly Discovered Evidence

For his final claim, Moore contends that "[b]ecause counsel [(presumably Attorney Dresow)] did not investigate the case diligently and thoroughly, a number of types of evidence that could have been used at trial to rebut or refute prosecution evidence [was] not discovered [or] . . . used at a new, fair trial."  Docket No. 1-1 at 13-15.  Moore lists examples of this "newly discovered evidence" as follows:

Example 1. Emails from defendant to Dave Williams and his boss Mark

Rizzo could have shed important light on relevant aspects of their long-term business relationship and issues of customer complaints, favorable customer reviews, etc.

Example 2. Co-workers of Dave Williams, such as Frank Horwood and others could have been interviewed and possibly testified about their recommendations of the defendant to all their customers who needed the services of a plumber.

Example 3. Online customer  reviews of both London Fireplace Shoppe and defendant['s] company.  How a plumbing company could have been introduced to gain perspective of how customers reacted to Dave Williams and to defendant Stan Moore.  (*See* Exhibit 3-6)

Example 4. Character references for defendant could have been exhibited at trial instead of only at sentencing.  (*See* Exhibit 1-20: a-o)  (citing Docket No. 1-2 at 43-69).

Example 5. A large amount of potential factual and enlightening testimony by the defendant was never known to counsel before trial and so was not used.  Much of this information has been highlighted under Ground 3[16] Facts.  All of the prosecution allegations could have been rebutted by the defendant with a diligent, adversarial defense at a new trial.  Failure to rebut prosecution evidence at trial led to unchallenged assertion assumed to be true.

*Id.* at 13-14 (footnote and brackets added).

Respondent argues that this constitutional claim is unexhausted but nonetheless should be rejected on the merits.  Docket No. 11-1 at 45-48.  The court agrees.  *See* 28 U.S.C. § 2254(b), (c).  Moore did not raise his claim of newly discovered evidence on direct appeal.  *See* Docket No. 12-18.  But, Moore *did* raise this claim in his petition for a writ of habeas corpus to the California Supreme Court.  *See* Docket No. 12-22.  There, however, he did not allege federal constitutional error in the claim or cite any such authority.  *See* Docket No. 12-22 at 7, 82-84 (Ex. L at AG006, AG081-83).  As the Ninth Circuit has explained in *Hiivala v. Wood*:

To "fairly present" his federal claim to the state courts, Hiivala had to alert the state courts to the fact that he was asserting a claim under the United States Constitution.  *Duncan v. Henry*, 513 U.S. 364, 365-66 . . . (1995).  The mere similarity between a claim of state and federal error is insufficient to establish exhaustion.  *See id.* at 366.  Moreover, general appeals to broad constitutional principles, such as due process, equal protection, and the right to a fair trial, are insufficient to establish exhaustion.  *See Gray v. Netherland*, 518 U.S. 152, 162-63 . . . (1996).

*See* 195 F.3d 1098, 1106 (9th Cir. 1999).

---

[16] Ground 3 refers to Moore's IAC claims.  *See* Docket No. 1 at 51-69; Docket No. 1-1 at 1-12.

The record shows that Moore presented a similar claim of newly discovered evidence in his state habeas filed in the state superior court, which summarized and rejected his claim as follows:

> Petitioner argues that he is entitled to a new trial because of newly discovered evidence.  In support of this claim Petitioner states that counsel should have:
>
> 1. asked for/subpoenaed email records between the victim and the Defendant to explain the relationship between the two,
>
> 2. subpoenaed co-workers to testify at trial about the good working relationship they had with Petitioner and
>
> 3. presented character witnesses on his behalf at trial and not just at sentencing.
>
> None of [petitioner's] arguments satisfy the required showing to be successful on a newly discovered evidence claim.  A criminal judgment may be collaterally attacked on the basis of newly discovered evidence only if the new evidence casts fundamental doubt on the accuracy and reliability of the proceedings.  The new evidence must undermine the entire prosecution case and point unerringly to innocence or reduced culpability.  *People v. Sutton* (1887) 73 Cal. 243, 247-248; *People v. Delgado* (1993) 5 Cal. 4111 312, 328.  Here, not only is there is no new evidence, but even if this evidence was presented at trial, the outcome would have been the same.

Docket No. 12-20 at 6.  Despite raising this claim before the state superior court, it was not presented as a federal constitutional claim, and as such is unexhausted and may not support relief.  *See* 28 U.S.C. § 2254(b)(1).  However, this court will deny relief on the unexhausted federal constitutional claim because the claim is plainly meritless.  *See* 28 U.S.C. § 2254(b)(1); *Cassett*, 406 F.3d at 623-24.

As mentioned above, Moore faults trial counsel for the fact the alleged newly discovered evidence was not presented at trial, but he fails to allege a violation of his right to effective assistance of counsel.  *See* Docket No. 1-1 at 13-14.  The court has not located any clearly established Federal law for the proposition that the mere existence of newly discovered evidence, or even previously discovered evidence, not presented at trial may give rise to a deprivation of a defendant's Sixth Amendment right to a fair trial.  *See* 28 U.S.C. § 2254(d)(1).  In fact, prior precedent from the Ninth Circuit has held that the court may consider new evidence presented for the first time in federal court so long as petitioner "'was not at fault in failing to develop that evidence in state court'" and that the new evidence must not so "'fundamentally alter the legal claim already considered by the state courts'" as to render it unexhausted.  *Detrich v. Ryan*, 677 F.3d 958, 984 (9th Cir. 2012)

United States District Court
Northern District of California

(rehearing en banc, *Detrich v. Ryan* 740 F.3d 1237 (2013)) (quoting *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986)).

      The court has also found no Supreme Court holding for the proposition that a failing by trial counsel to discover and present new evidence may give rise to a violation of a defendant's Sixth Amendment right to a fair trial, as distinct from a defendant's Sixth Amendment right to the effective assistance of counsel.  The purpose of the Sixth Amendment right to effective counsel—along with several other rights listed in the Sixth Amendment—is to ensure that criminal defendant's receive a fair trial.  *Pinholster*, 563 U.S. at 189.  Such rights are not coextensive, however.  *See* U.S. Const. amend. VI, § 1; *Riggins v. Nevada*, 504 U.S. 127, 139-40 (1992) (Kennedy, J., concurring); *see also Hiivala*, 195 F.3d at 1106 (explaining that "general appeals to broad constitutional principles, such as due process, equal protection, and the right to a fair trial, are insufficient to establish exhaustion").  Thus, Moore's fair trial claim fails at the outset for lack of clearly established Supreme Court precedent.

      Even assuming Moore's claim is cognizable under 28 U.S.C. § 2254(d)(1), the court has determined above that it may still be rejected on the merits despite the failure to exhaust state court remedies, *id.* § 2254(b)(2).

      First, Moore notes that the new evidence was "not discovered" by counsel.  *See* Docket No. 1-1 at 13; *see id.* at 14 ("A large amount of potential factual and enlightening testimony by the defendant was never known to counsel before trial and so was not used.").  All the cited evidence, to the extent such evidence might have existed, would have been known by Moore before trial, yet there is no indication that Moore told counsel about such matters.  *See id.*  At least in the context of claims alleging ineffective assistance of counsel, the Supreme Court stated as follows:

> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.  Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant.  In particular, what investigation decisions are reasonable depends critically on such information.

*Strickland*, 466 U.S. at 691; *see also Paradis v. Arave*, 954 F.2d 1483, 1491 (9th Cir. 1992) *cert. granted* (judgment vacated by *Arave v. Paradis*, 507 U.S. 1026 (1993)).  Moore fails to explain how

1    counsel should have otherwise learned of the purported evidence beyond a general assertion that

2    counsel "did not investigate the case diligently."  Docket No. 1-1 at 13.

3          Second, Moore's claim is entirely speculative.  He does not describe any of the evidence in

4    detail, provides no clarity concerning whether such evidence in facts exists, and does not explain

5    why such evidence would have been relevant to his defense, much less so helpful that the failure to

6    present could deny him a fair trial.  *See id.* at 13-14.

7          Lastly, Moore fails to make a proffer of any of the alleged evidence, including the omitted

8    emails, online customer reviews, proposed co-worker testimony, or a statement for character

9    witnesses that they would appear to testify for Moore as to his character and subject themselves to

10   cross-examination.  That omission is fatal to his claim.  *See Greenway v. Ryan*, 856 F.3d 637, 680

11   (9th Cir. 2017); *Matylinsky*, 577 F.3d at 1096-97; *Davis v. Woodford*, 333 F.3d 982, 1003 (9th Cir.

12   2003) (amended and superseded on denial of rehearing); *Dows v. Wood*, 211 F.3d 480, 486 (9th Cir.

13   2000); *Ceja v. Stewart*, 97 F.3d 1246, 1255 (9th Cir. 1996); *United States v. Berry*, 814 F.2d 1406,

14   1409 (9th Cir. 1987); *Lawrence v. Armontrout*, 900 F.2d 127, 130 (9th Cir. 1990).

15         In summary, Moore's claim concerning newly discovered evidence is conclusory,

16   speculative, and unsupported by a proffer of evidence or explanation.  Though the claim is

17   unexhausted, it should be denied on the merits.  *See* 28 U.S.C. § 2254(b)(2).  Therefore, Moore is

18   not entitled to the writ on this claim.

19

20                    E.   No Certificate Of Appealability

21         A certificate of appealability will not issue.  *See* 28 U.S.C. § 2253(c).  This is not a case in

22   which "reasonable jurists would find the district court's assessment of the constitutional claims

23   debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

24

25

26

27   ///

28

United States District Court
Northern District of California

**CONCLUSION**

For the foregoing reasons, the petition for writ of habeas corpus is DENIED.

The clerk shall close the file.

Moore's motion for an evidentiary hearing is also DENIED.  Docket No. 1 at 39.

**IT IS SO ORDERED**.

Dated: August 10, 2022

_____

SUSAN ILLSTON
United States District Judge